UNITED STATES, Appellee

v

JACK K. GRANT, Master Sergeant, U. S. Army, Appellant

10 USCMA 585, 28 CMR 151

No. 12,899

Decided August 14, 1959

█▌ 

*First Lieutenant Herbert R. Brown* argued the cause for Appellant, Accused. With him on the brief was *Captain Arnold I. Melnick.*

*First Lieutenant Allen I. Saeks* argued the cause for Appellee, United States. With him on the brief was *Lieutenant Colonel James G. McConaughy.*

## Opinion of the Court

HOMER FERGUSON, Judge:

Charged with larceny and making a false claim against the United States in violation, respectively, of Uniform Code of Military Justice, Articles 121 and 132, 10 USC §§ 921, 932, the accused was found guilty of wrongful appropriation of the stated sum and of making the false claim in question. Intermediate appellate authorities affirmed, and we granted the accused's petition for review on the question whether the law officer abused his discretion in overruling a defense motion for a mistrial based upon the court-martial's receipt of certain testimony from Colonel John K. Flemming, which was later stricken from the record. Proper appreciation of the seriousness of the matter requires that we set forth in some detail the evidence adduced at the trial.

During the early part of 1958, Specialist Seals assisted the accused in the preparation of his income tax return. Seals and the accused were both assigned to the unit personnel office, the former to the section involved in the preparation of Class Q allotment claims. The accused advised Seals that he had a son. Seals told the accused that he was entitled to receive a Class Q allotment if he could substantiate the existence of the child with documentary evidence. On behalf of the accused, he prepared the necessary claim form (DD Form 137) and placed it in his "hold basket," pending receipt from the accused of the necessary documents. The form recited that the accused had a son, Jack K. Grant, Jr.; that the child's mother was dead; that accused contributed $115.00 per month to the child's support; and that he resided with an aunt in Denver, Colorado, whose name was Mrs. Beulah Sells. In fact, Mrs. Sells was not related to the accused, who had once roomed with her, and was not the custodian of any child. The accused had nevertheless once informed her that he had a son. The accused's enlistment and service records reflected that he had no dependents.

While Seals was absent on leave, accused's allotment claim form was placed on the desk of Warrant Officer Bishop, the Unit Personnel Officer, whose duties required him to satisfy himself concerning the existence of dependents claimed to be entitled to allotments and to certify on the form that the claim of qualifying relationship had been reviewed and found to be true. Bishop informed the accused he could not process the claim until documentary evidence was presented concerning the child's existence. The accused stated he would procure the required papers but, in fact, never did so. At no time did the accused indicate to Mr. Bishop that he intended to withdraw the claim or that Bishop had received it erroneously.

**587**

In May 1958, the accused was designated to collect donations for the Army Emergency Relief Fund in Headquarters Company, U. S. Army Garrison, Fort Carson. He collected the sum of $269.00 from various personnel on May 29, 1958, and placed it in an envelope. The envelope was turned over to the company commander, Captain Carter, who placed it in his safe. On June 4, 1958, the envelope was redelivered to the accused in order that the funds might be turned in to the Army Emergency Relief Office. Captain Carter testified that the accused informed him on the same day that he had turned in the funds and obtained a receipt. On June 18, it was ascertained that the Army Emergency Relief Office had never received the sum collected by the accused and that his receipt was not in the form invariably utilized by that office. Subsequently, in three pretrial statements, the accused sought to account for the loss. Initially, he stated he had visited Post Headquarters and handed the money over to an unidentified woman who had given him the receipt. In the latter two statements, he admitted the falsity of his previous declaration and that his receipt was fraudulent. He then stated he had converted the money to his own use in order to pay certain debts. However, he also evinced an intention to replace the donations.

After the foregoing matters were adduced, the accused elected to testify in his own behalf. With regard to the larceny charge, he averred that all of his pretrial statements were false and that, in reality, he had been unable to turn in the funds on the afternoon he received them from Captain Carter, as the Army Emergency Relief Office was closed. He placed the envelope containing the money in his desk. Press of other duties prevented him from delivering the donations for several days, and when he finally decided to act on the matter, he discovered the envelope and its contents were missing. He informed no one of the true state of affairs, as he did not expect anyone to believe him. He lied in order to gain time to replace the stolen money and because he was under pressure as the

result of a pending elimination board proceedings. Captain Carter was mistaken in his impression that accused had spoken of a receipt on June 4, 1958. Actually, he had mentioned a receipt for the first time on the day it was discovered he had not turned in the money.

The accused also stated that he had an illegitimate son, Jack K. Grant, Jr., born in 1941. The son resided in Chattum, Louisiana, with two aunts and had never lived with the accused. Mrs. Sells was not related to him and had never had custody of the child.

With the evidence in the foregoing posture, the trial counsel, Lieutenant Isaac, cross-examined the accused as follows:

"Q. Do you recall having a conversation with . . . Colonel Flemming a few weeks ago?

. . . . .

"A. Yes, sir, I do.
"Q. What was that conversation about, the nature of it?
"A. It concerned the repayment of the . . . paying back of the misplaced money of the AER Fund, sir.
"Q. Tell the court what you told Colonel Flemming.
"A. I don't understand what you mean, sir.
"Q. Well, can you understand this, I want you to tell the court what you told Colonel Flemming during that conversation.
"A. I don't recall what I told him, sir. It was what he told me.
"Q. What did he tell you?
"A. He told me that he wanted me to make some effort towards paying back the misplaced money for the AER Fund, sir.
"Q. You did not make any statement to him then?
"A. Just answered the questions that he asked me, sir.
"Q. *You did not make any statements in the nature of an admission or confession to him then?*
"A. No, sir; he never asked that question, sir." [Emphasis supplied.]

In rebuttal, trial counsel called Colonel Flemming as a witness. Following his identification of the accused

and establishment of his own identity, including his position as Commanding Officer, Headquarters Command, U. S. Army Garrison, Fort Carson, Colonel Flemming testified as follows:

"Q. Colonel, do you recall if you had a conversation with the accused sometime subsequent to his confinement at the post stockade in reference to the AER Funds?

"A. Yes.

"Q. Would you relate the substance of that conversation to the court, please?

"A. I have known Sergeant Grant for approximately three years. He worked for me in the personnel section at TPC. When he was in Division, shortly after I assumed command of Army Garrison, he came to me and wanted to be assigned to Garrison. So I had him assigned to our personnel section there. His background on my relationship with Sergeant Grant, he had a habit of writing rubber checks . . .

"IC: Now, if the court please, I am going to object to this as not responsive to the question and it is not material.

"LO: I will sustain the objection. I don't believe that is proper.

"WITNESS: I can only testify as to background of Sergeant Grant as to why I called him before me and what we had to say at the time.

"LO: Very well.

"WITNESS: I think it is germane to the subject, the various transactions between myself . . .

"TC: Colonel, the point we would not want to prejudice the rights of the accused and bring in any possible evidence . . .

"A. Well, needless to say, Sergeant Grant had been before me on several occasions. I had him confined when this AER, to put it kindly, misappropriation, came up. After he had been in confinement, oh, some several weeks, I heard that he was attempting to reverse his story and to deny his previous confession and to deny the statements he had made under oath to investigators. So I had him brought over to my office; and we discussed the transaction and *during*

*this course of this conversation Sergeant Grant admitted to me that he had taken this money. Further, he offered to make restitution insofar as he was possible.* I immediately called his company commander, Captain Carter, and in Captain Carter's presence Sergeant Grant reiterated the statement to me and voluntarily . . . volunteered to make restitution insofar as possible to the money which had been missing. I took him up on this deal and made arrangements with the finance office to give him advance pay of two weeks of all that was coming to him in two weeks in advance. I forgot the exact amount, I believe something like $153 he had coming to him. Of this $153 he made restitution of $140. I understand from Captain Carter that the AER officer and Sergeant Grant went to the finance office, collected this money and the AER officer gave him a receipt for $140. If it is necessary to fix the exact date, that receipt will show it.

"Q. You say you know Sergeant Grant here for approximately three years, is that right?

"A. Right.

"Q. Do you know what is [sic] reputation would be for truth and veracity?

"A. Well, there is only a four-letter word that would describe it, he is a liar, a psychopathic liar. I have had him before me and he would tell me one story and two days later he would completely forget what he told me and reverse himself. This is what I was about to say in this rubber check business. I had him before me on this business and he would tell me I have done this, and then it had not been done." [Emphasis supplied.]

Upon motion of the defense counsel, the law officer struck that portion of Colonel Flemming's answers relating to "other offenses" and instructed the court members to disregard it. Following cross-examination of the witness, the defense moved for a mistrial. The law officer denied the motion but struck all of the witness' testimony from the record and admonished the court to dis-

regard it. He repeated his admonition in his final instructions.

There can be no doubt that it was error to receive Colonel Flemming's testimony concerning Sergeant Grant's purported confession of guilt to him. As our quotation of the record indicates, no effort was made to show compliance with Code, supra, Article 31, 10 USC § 831, prior to offering it in evidence. This is an indispensable predicate for the introduction of such incriminatory statements. United States v Grisham, 4 USCMA 694, 16 CMR 268; Manual for Courts-Martial, United States, 1951, paragraph 153b. Similarly, the witness' unbridled references to accused's alleged proclivity for writing "rubber checks" was completely irrelevant and inadmissible. United States v Shipman, 9 USCMA 665, 26 CMR 445; United States v Shepherd, 9 USCMA 90, 25 CMR 352. Reception of the other parts of his testimony indicating an abiding opinion of the accused's guilt was equally improper. Without dissecting his statement sentence by sentence, suffice it to say we are convinced that Colonel Flemming's testimony, considered as a whole, should have been excluded. Thus, we are squarely faced with the question whether it was sufficient for the law officer to strike the offensive declarations from the record and admonish the members to disregard the matter.

A motion for mistrial is addressed to the law officer's sound discretion, and we have repeatedly indicated that we will reverse only where his ruling constitutes an abuse of that discretion. United States v Patrick, 8 USCMA 212, 24 CMR 22; United States v Shamlian, 9 USCMA 28, 25 CMR 290. Thus, in United States v Patrick, supra, we found that the law officer's granting of a motion to strike inadmissible testimony and instruction to the court to disregard it in their deliberations was sufficient to overcome any prejudice inherent in a witness' testimony that the accused was engaged in the sale of leave papers. And in the *Shamlian* case, supra, we reached a similar conclusion concerning the effect of the trial

590

counsel's remarks about the accused's previous convictions and attitude toward the service. On the other hand, in United States v Richard, 7 USCMA 46, 21 CMR 172, we found that declarations by a court member during the challenge procedure concerning the accused's prior history of misconduct and the results of certain polygraph tests required the law officer to declare a mistrial. The instant case is more closely related to the last mentioned situation.

The court members were confronted with the testimony of a witness who was not only a senior Army officer but also the Commanding Officer of the garrison forces at the post at which the court met and to which its members were assigned as personnel of lodger units. Not only was he permitted to testify concerning accused's confession of guilt to him without the necessary predicate of a warning being shown, but he also "improperly depicted the accused as 'a despicable character' unworthy of belief by the court-martial." United States v Shepherd, supra. It is difficult to see how the members could erase from their minds the damning effect of Colonel Flemming's vituperative declarations and accord to the accused the fair trial to which he is entitled. As was succinctly stated in People v Deal, 357 Ill 634, 192 NE 649 (1934), at page 652:

". . . Human nature does not change merely because it is found in the jury box. The human mind is not a slate, from which can be wiped out, at the will and instruction of another, ideas and thoughts written thereon."

Accordingly, we conclude that the law officer abused his discretion in denying the defense motion for a mistrial.

The Government argues, however, that any prejudice inherent in the denial of the motion was overcome by the compelling nature of the evidence of accused's guilt. Assuming *arguendo* that the proof of guilt is compelling, the short answer to the Government's contention is that the accused is entitled to a fair hearing. United States v Shepherd, supra. And we have unhesitat-

ingly rejected the idea that compelling evidence has any curative effect when a confession has been introduced without showing compliance with Code, supra, Article 31. Cf. United States v Minnifield, 9 USCMA 373, 26 CMR 153; United States v Yearty, 8 USCMA 191, 23 CMR 415; United States v Williams, 8 USCMA 443, 24 CMR 253. Colonel Flemming's testimony undoubtedly introduced these infirmities into the record, and we reject any notion that their prejudicial effect can be overcome by reference to the strength of the prosecution's case.

The decision of the board of review is reversed and a rehearing is authorized.

Chief Judge QUINN concurs.

LATIMER, Judge (dissenting):

I dissent.

The single question presented by this appeal is whether the law officer erred in not granting a motion by defense for a mistrial. While a reading of the majority opinion makes it appear that the law officer committed an egregious error in ruling against the accused, when the record is viewed in its true perspective it appears to me he ruled well within the limits of his discretion. In that connection, it must be remembered he was confronted with well-recognized alternative methods of correcting an error introduced into the record by a cantankerous witness. I need not decide whether he chose the better of the two means, for discretion permits some latitude of choice. Here, he concluded the effect of the Colonel's testimony could be effectively neutralized by the procedure he adopted, and times without number trial judges have used the same curative process. And it is only in rare instances that they are overruled on appeal. That is as it should be, for they are better able to assess the damage inflicted by trial incidents than are appellate judges, since they are mingling with the actors and we are only reading the script. Obviously, my associates believe this to be the exceptional case but, as I read the record, a holding that the law officer abused his discretion is not warranted. In order to support the position I take,

it is necessary that I develop more fully the situation which confronted him when he made his ruling.

Initially, I digress to call attention to a statement made in the Court's opinion which would lead the reader to believe that Colonel Flemming's rank and position might influence the court members to give his testimony more than the usual weight. The facts are that this court was appointed by a Major General who was in command of Fort Carson, Colorado. The membership consisted of officers over whom the Colonel exercised no command responsibility and, while the law officer may have been assigned to the same command, I am certain the record will show he was uninfluenced by the Colonel's alleged importance. Certainly, when a law officer strikes the entire testimony of a superior officer and repeatedly admonishes the court that they must disregard every bit of his testimony, I have some difficulty in concluding he, the military judge, was cowed by rank. On the contrary, I find this officer displayed a commendable independence.

In United States v Richard, 7 USCMA 46, 21 CMR 172, we laid down the rule that action upon a motion for mistrial rests within the sound discretion of the law officer in the light of the circumstances existing at the time the motion was presented. With that principle as the background, I look to the record for the facts to support my views.

Colonel Flemming was called as a rebuttal witness to dispute certain testimony given by the accused. At that time, all direct testimony was before the court and the members were fully apprised of the evidence of the prosecution and the defense. Generally speaking, Colonel Flemming's "vituperative declarations" consisted of stating that the accused had issued rubber checks; he was a psychopathic liar; and he admitted taking the money. Undoubtedly, in certain close factual situations this sort of testimony might tip the scales of justice against an accused, but here the testimony was either admissible or it was no more than cumulative of the testimony given by the accused while

591

he was on the witness stand. I support those observations briefly, not because I seek to justify the presence of the questioned testimony in the record, but as stepping stones leading up to my basic premise that the inadmissible testimony of the Colonel could be easily disregarded by the court members.

It should hardly be necessary for me to advance the proposition that in a larceny or embezzlement ▮ trial, evidence which tends to show a motive for the crime is admissible. Outstanding bad checks offer a good reason to misappropriate money and, while the Colonel's testimony in that regard was volunteered, not responsive to a question, and lacking in specificity, absent a motion to strike on one of those grounds, it was admissible. While it was subsequently stricken with the other testimony, the accused was benefited by that ruling.

The comment that the accused was a psychopathic liar was quite unnecessary, but it was merely ▮ cumulative of accused's own testimony and the court was well aware of that characteristic before the Colonel testified. Without any doubt the accused did a much better job of tarring himself with that discrediting trait than did the Colonel. This is the record to support that assertion. The accused executed three written pretrial statements under oath, and when he was on the witness stand he admitted he lied in each instance. Manifestly, the nature of his stories points up the fact that they were fully fabricated and not the result of inadvertence or mistake. In his first statement, he asserted he had turned the collections into the Army Emergency Relief office and possessed a receipt for the payment. To support this concocted version, he submitted a false receipt. In the next written admission, he averred that he went to the office of the Army Emergency Relief and was informed by a lady that the office was closed but would be open the next day. He placed the money in his desk drawer, where it remained for about ten days. At that time, he was visited by a friend to whom he gave $255.00, and he spent

the remaining $14.00. He finished off his three pretrial variations by swearing under oath to this statement:

"On or about 2 June 1958 I, Master Sergeant Jack K Grant RA 34 071 271 Headquarters Company, United States Army Garrison, Fort Carson, Colorado did receive from Captain Ircel L Carter, my commanding Officer an envelope containing $269.00 which had been collected from members of Headquarters Company, USAG, Fort Carson, Colorado for the Army Emergency Relief fund, Fort Carson, Colorado.

"I proceeded to Post Headquarters with the funds but upon arrival, there was no one in the Army Emergency Relief Office. A lady whom I assumed to be an employee suggested that I return the next day.

"On 3 June 1958, this $269.00 was used by me to pay debts which I owed at Fort Carson and Colorado Springs, Colorado. After using the money I began to wonder how I could replace it. Then I realized that the Army Emergency Relief Fund Drive could be extended thru September 1958, which would allow me ample time to replace it.

"On 18 June 1958, with the $269.00 in my mind, I went to Colorado Springs, Colorado. While walking down the street, I met a civilian man, name unknown, who wanted some money from me. the same man (civilian) followed me to the Columbine still asking for money. We sat in a booth at which time I gave him a dollar ($1.00). He stated that if he could be of any help to me at any time, let him know. I told him that a friend of mine needed a favor. He stated "name it". I told him that this friend need [sic] a receipt showing that $269.00 in cash had been turned over to the Army Emergency Relief by me. I instructed him to write 'Received from Headquarters Company, USAG, $269.00 for the Army Emergency Relief. Received by M. G. B. 2-6-58'.

"After he had finished writing the receipt, I picked it up, put it in my pocket, and returned to my unit.

"On 19 June 1958 Capt. Cook instructed me to take the receipt to the Chairman of the Army Emergency Relief Fund Drive. At this time I attached the receipt to the roster of contributors, and proceeded to Post Headquarters, turned the receipt and roster over to Major Smith.

"On 20 June 1958 I contacted Sgt. Cleveland McConnico, Headquarters Company USAG and asked him if any one asked him if he saw me transact some business in Post Headquarters (Army Emergency Relief Office) to say yes."

As previously noted, when he was testifying in his own behalf, he admitted the foregoing versions were all false and stated that the true version was substantially as follows, which I quote from the board of review opinion:

". . . I took the envelope containing the $269.00 I had collected to the AER office arriving about 1615 hours on 2 June which time I found the AER office closed, and was advised to return in the morning. I did not return and the money remained in my desk drawer. Sometime between the 12th and 14th of June I discovered that the envelope which contained the money was missing from my desk. I did not tell the truth in the first statement because I did not think anyone would believe me and because I was under a 'tremendous amount of pressure' as the result of being considered for an administrative discharge and because 'I had to try and delay to do something to get that money to avoid being accused of having taken it myself'. I did not steal the money. I intended to replace it. I do not expect the court to believe my story because 'no one . . . . would have believed it if I had told it in the first place'. Wilson really exists but he had nothing to do with the case. It is true that I took Investigator Gardner to Headquarters for the purpose of identifying the person mentioned in my first pretrial statement even though I knew such a woman did not exist. It was not a girl friend or a man 'name unknown', but a soldier named Hill who wrote the fake receipt for me. I do not know why the fake receipt was made up before the interrogation of 19 June. It is true that on 4 June I told Captain Carter that I had turned in the money and obtained a receipt but did not have it with me at the time. Yes, I did have a conversation with Sergeant McConnico. It occurred after I made my first pretrial statement. 'In trying to stall for time, sir, I told him if any-one asked if he had seen me on the 2nd of June, whether or not he had taken me to Post Headquarters, to say he had.' I cannot explain why I made up the fake receipt prior to my pretrial statement of 19 June."

In addition to all of the foregoing on the larceny offense, the accused admitted furnishing false information in his claim for a quarters allowance. Certainly, when accused left the witness stand there was little doubt about his proclivity for not telling the truth.

The third item furnished by the Colonel, concerning accused's admission of taking the money, was consistent with two of his pretrial statements and was clearly admissible unless, as my associates contend, a violation of Article 31, Uniform Code of Military Justice, 10 USC § 831, is involved. I need not argue whether an accused in his testimony can deny having a conversation with a third party and then bar the Government from showing the true fact, particularly when there is no objection. But that is all beside the point, for to assert the accused's statutory right was violated in this instance is no more than "boot strap" reasoning. That contention assumes a fact entirely contrary to the record. Here the Colonel's testimony was not before the court as it was stricken and the court was directed that the admission could not be considered. Had the evidence been left for the court to consider, then Article 31 might be of importance, but our problem is solely whether the court-martial responded to the instructions of the law officer and disregarded all the testimony of the Colonel, including the inculpatory admission. I, therefore, pass on to consider that question.

The majority opinion quotes the testimony of the Colonel and then states

generally the action of the law officer. I prefer to go further and quote his directions to the court and defense counsel's reply to a question concerning the admonition. Parenthetically I mention that the accused was represented not only by certified military defense counsel but, in addition, by individual civilian counsel who was a member of the Colorado State Bar:

"IC: I move that all of that answer pertaining to anything other than this be stricken as being highly prejudicial to this accused.

"LO: Your motion is granted. That portion of the witness's testimony regarding previous offenses allegedly committed by the accused will be stricken from the record and disregarded by the court.

"IC: And the court be directed to disregard it.

"LO: That is correct. The court will disregard it.

. . . . .

"TC: The prosecution at this time waives opening argument.

"IC: For the record, if the court please, I think that on Colonel Flemming's testimony the defense moves for a mistrial. I might elaborate on that. If I could assure myself that the members of this court could erase all of that prejudicial and erroneous narrative testimony from the record, I would be pleased to carry on with this. However, I will leave it up to the law officer, but for the record I do wish to move for a mistrial.

"LO: Before ruling on the defense motion, the court will recess for ten minutes.

"The court recessed at 1440 hours, 5 September 1958.

"The court opened at 1445 hours, 5 September 1958.

"PRES: The court will come to order.

"TC: Let the record indicate that all parties present prior to the recess are again present.

"LO:The motion of the defense for a mistrial will be denied. In connection with the testimony of the last witness, Colonel Flemming, the court is admonished to disregard the an-

swers elicited to the questioning of the last witness. It is not to be considered as evidence in this case and will not be considered by the court in reaching a finding in the case. It will be stricken from the record. Proceed. I believe prosecution has waived opening argument.

"One more thing, does the prosecution or defense have any objections to the admonition given the court?

"TC: Prosecution has none.

"IC: Defense has none, sir.

"PRES: The question comes up in some of the minds of the court members, would it be possible to clarify this to have read just that portion of the last witness's answers which is allowable or has bearing on this case?

"LO: No, sir; in my instruction to the court I meant to imply that the entire testimony will be stricken and disregarded by the members of the court.

"PRES: That answers the question."

In his final instructions, the law officer again admonished the court in the following language:

"LO: The court is advised that it will disregard the testimony of the witness called in rebuttal by the prosecution, Colonel Flemming; the testimony will be disregarded in its entirety and not considered in the court's determination of the findings in this case."

I acknowledge the philosophical question from People v Deal, 357 Ill 634, 192 NE 649, and agree that "the human mind is not a slate, from which can be wiped out, at the will and instruction of another, ideas and thoughts written therein." However, in that instance there was no instruction by the judge to disregard the inflammatory statements of the district attorney, and the ideas and thoughts given to that court were not reinforced by similar notions and impressions furnished by the defendant. In this case it would be easy to wipe out the thoughts and ideas of the Colonel, for there remained written on the slate in bold relief the accused's own inscription of his lack of veracity.

It is sometimes most difficult to ascer-

594

tain the effect of inadmissible testimony on a trier of fact, but here ■■■■ all the indicia, together with the action of the court-martial, bespeak a total absence of harm. Defense counsel was not unduly concerned about the impression made by the Colonel, for he candidly announced he was making the motion for the purpose of saving the record and he would leave to the law officer the method of curing the asserted harm. But the best measuring rod for any prejudice flowing out of this sort of trial incident is the findings and sentence of the court-martial. The accused was charged with larceny, which allows a maximum penalty of five years confinement, total forfeitures, and a dishonorable discharge. In addition, he was tried for making a fraudulent application for quarters allowance in an amount more than $50.00, which permits a similar sentence of dishonorable discharge, total forfeitures, and confinement of five years. Totaled together, for the charges alleged the accused could have been sentenced to a dishonorable discharge, ten years confinement, and total forfeitures. The court could have hardly been prejudiced by the uncalled-for remarks of the Colonel, for it reduced the larceny charge to wrongful appropriation, assessed only a bad-conduct discharge, and imposed confinement and forfeitures for a period of one year. In the light of the accused's false statements under oath, his voluntary pretrial confession, his false information in his Class Q allotment application, his presentment of false receipts, his attempts to involve his friends by inducing them to falsify and forge receipts, and his devious methods to escape detection, the court-martial in its findings and sentence showed commendatory restraint. Significantly enough, my brothers do not deny the evidence is overwhelming and compelling. On the contrary, they tacitly admit such is the case. With that concession and with full knowledge of the leniency extended to the accused by the court-martial, I fail to understand why they conclude the court-martial members could not and did not comply with the reiterated and positive admonitions of the law officer. Certainly, unless my associates intend to reject the principle that the ruling of a law officer on a motion for mistrial will not be reversed unless he abuses his discretion, this finding and sentence should be affirmed. They are not and, in view of the present holding, I can only assume the law officer's discretion to rule against the accused is narrowed to a filament so fine that it fades into nothingness.

I would affirm the decision of the board of review.