UNITED STATES, Appellee

v

L. C. BOLDEN, Sergeant, U. S. Army, Appellant

11 USCMA 182, 28 CMR 406

*First Lieutenant Burnett H. Radosh* argued the cause for Appellant, Accused. With him on the brief were *Lieutenant Colonel W. H. Blackmarr, Captain Arnold I. Melnick,* and *First Lieutenant William L. Garwood.*

*First Lieutenant George J. Miller* argued the cause for Appellee, United States. With him on the brief was *Lieutenant Colonel James G. Mc-Conaughy.*

## Opinion of the Court

HOMER FERGUSON, Judge:

The accused was tried by an Army general court-martial in Korea and found guilty of stealing 18,240 pounds of coffee, in conjunction with Private Ramon Aragon and Private Earl Lyons, Jr., in violation of Uniform Code of Military Justice, Article 121, 10 USC § 921. He was sentenced to dishonorable discharge, forfeiture of all pay and allowances, and confinement at hard labor for five years. With some reduction in the period of confinement adjudged, intermediate appellate authorities affirmed findings of guilty of attempted larceny, and we granted review on the issues whether the accused was prejudiced by the trial counsel's persistent interrogation of a prosecution witness who had invoked his privilege against self-incrimination and whether the law officer should have instructed the court members to draw no inferences from that election not to testify.

The Government contends Sergeant Bolden was a truck dispatcher at Inchon Port, Korea. His duties included the release of vehicles carrying cargoes of supplies to various Army facilities throughout Korea. Inspired by a Korean black marketeer, he and Private Aragon, a truck driver, conceived a plan whereby a truckload of Army coffee would be diverted from its proper destination into the hands of the black marketeer. Private Lyons, serving as a truck guard, was offered a bribe on the morning of the proposed diversion in order to insure that he did not interfere with the theft. The scheme failed in its execution when military police were seen following the truck. Aragon and Lyons were apprehended with the vehicle and coffee at a point some distance off their authorized route. Bolden was taken into custody at a later time. All were subsequently charged with larceny, and a joint trial was directed. However, a severance was effected prior to any hearing being conducted.

At Bolden's trial, Lyons, whose case had also been referred to a general court-martial, was called as a witness for the prosecution. Upon Lyons' appearance, the defense counsel sought an out-of-court hearing to which the trial counsel promptly objected. The law officer initiated a side-bar conference at which defense counsel indicated the prosecution was aware that the witness would refuse to testify but was calling him in order to inflame the court with the claim of privilege. Upon trial counsel's complaint that he was having difficulty in hearing, the side-bar conference was terminated and an out-of-court hearing ordered. The defense counsel reiterated his objection, and the trial counsel pointed out that he did not know whether Lyons would testify or not, although he had been informed by Lyons' counsel that he had advised his client that he need not give evidence with relation to the offense charged. The law officer overruled the defense objection and stated that he would inform the witness of his privilege. Upon exception to this by the prosecution, the law officer modified his ruling to note that he would delay warning the

witness until he had an opportunity to testify voluntarily.

Upon the reconvening of the court, Lyons was asked the usual introductory questions by the prosecution, and it was ascertained that he was acquainted with the accused Bolden. When the witness' attention was directed to the date of the offense charged, defense counsel interposed an objection based upon the former's ignorance of his right not to testify. Thereafter, the law officer questioned Lyons and determined that he was fully aware of his privilege. He overruled the defense objection, and the witness' interrogation proceeded.

The trial counsel asked Lyons approximately forty-six questions. Seventeen required the witness to claim his privilege or sought to elicit from him the reasons for his desire to remain silent. Other inquiries dealt with apparently innocuous or collateral matters and were fully answered. Interspersed among the queries and replies were various comments by the prosecution on the witness' silence. Typical of these are the following:

"Q. I direct your attention to 6 May 1958. What were your military duties on that day?

"A. I refuse to answer that question under Article 31.

"TC. I beg your pardon.

.    .    .    .    .

"A. I do not wish to answer that question.

"Q. On what grounds?

"A. Article 31, sir.

"Q. Do you mean Article 31 of the Uniform Code of Military Justice?

"LO: I believe the court and the prosecution is well aware that the witness will not answer that question because he has asserted his right against self-incrimination.

"We will proceed."

Suffice it to say that the answers given by Lyons contributed nothing to the prosecution's proof.

The initial issue presented for our consideration is whether the trial counsel erred to the accused's prejudice by his persistent interrogation of the witness Lyons over the latter's repeated claim of his privilege against self-incrimination. At the outset, we reject the Government's argument that trial counsel's conduct was not erroneous because he did not "know" that Lyons would not testify. While his initial disclaimer might have had some validity, his "ignorance" was quickly dispelled by the witness, and the Government's contrary assertion is simply not supported by the record. Moreover, we agree with the contention of appellate defense counsel that the continued questioning of the witness and the repeated claim of privilege was erroneous.

In United States v Maloney, 262 F 2d 535 (CA 2d Cir) (1959), a similar situation was presented in a Federal prosecution for conspiracy. Continued interrogation of three Government witnesses was permitted over their claim of privilege. The prosecution referred to the refusal of one to testify in such a manner that the jury was allowed to infer that, had the witness testified, his responses would have been favorable to the United States. In reversing the cause, Judge Learned Hand pointed out:

"When a witness claims his privilege, a natural, indeed an almost inevitable, inference arises as to what would have been his answer if he had not refused. If the prosecution knows when it puts the question that he will claim the privilege, it is charged with the notice of the probable effect of his refusal upon the jury's mind." [262 F 2d, at page 537.]

While the reversal in that case was expressly predicated upon the weakness of the Government's case and upon the lack of an admonition to the jury to disregard any inferences which it might otherwise draw from the witness' refusal to testify, the decision clearly points out that it is improper to continue the questioning of a witness over his claim of privilege. See also United States v 5 Cases, Etc., 179 F 2d 519

(CA 2d Cir) (1950) and United States v Tucker, 267 F 2d 212 (CA 3d Cir) (1959). In the latter case, reversed on other grounds, it was stated, at page 215:

" . . . During the first trial a witness asserted his privilege against self incrimination when asked about transactions relevant to this prosecution. At the second trial, which led to the present appeal, this witness was again called and subjected to similar inquiry. He again pleaded privilege. There is no suggestion that the government had any reason to believe that at the second trial the witness would answer those questions he refused to answer at the first trial. In similar circumstances, two courts of appeals have already warned that a second interrogation, which has no apparent purpose but to invite invocation of the privilege against self incrimination, is improper and is likely to constitute reversible error. . . . On a third trial of this indictment, the witness in question should not be interrogated about any matter to which the government has reason to believe he will interpose a proper plea of self incrimination. *In our view an interrogating official himself gravely abuses the privilege against self incrimination when, believing a truthful answer will incriminate a witness, he nevertheless insists on asking the incriminating question with a view to eliciting a claim of privilege and thereby creating prejudice against the witness or some other party.* . . . " [Emphasis supplied.]

The learned Dean Wigmore also points out that the great weight of authority is to the effect that no unfavorable inference is to be drawn from a witness' claim of the privilege against self-incrimination. Wigmore, Evidence, 3d ed, § 2272. The Manual for Courts-Martial, United States, 1951, does not deal directly with the problem, contenting itself with a general discussion of the application of the privilege and the duty of the law officer to warn an apparently uninformed accused of his rights. Manual, supra,

paragraph 150*b*. We have previously considered one of its fringes, for, in United States v Kowert, 7 USCMA 678, 23 CMR 142, we pointed out that it was prejudicially improper to receive evidence that an accused, relying upon his rights under Code, supra, Article 31, refused to answer self-incriminating questions. See also United States v Armstrong, 4 USCMA 248, 15 CMR 248.

The foregoing authorities compel the conclusion we reach here. If no adverse inference is to be drawn from a witness' claim of privilege, it follows that the extended interrogation of such a witness, knowing he will repeatedly claim his privilege, is even more to be condemned. United States v Maloney, supra; United States v Tucker, supra. We are certain, therefore, that the trial counsel acted improperly in his lengthy examination of Lyons. Parenthetically, we note the entire controversy could have been avoided had counsel and the law officer questioned the witness himself in the out-of-court hearing to determine whether he intended to avail himself of his obvious right not to testify.

Our discussion of the first issue is equally dispositive of the question whether the law officer should have admonished the members of the court to disregard Lyons' refusal to testify and to draw no inferences from his claim of privilege. As developed in the cited cases, the vice of knowingly requiring a witness to claim his privilege in the presence of the members of the court is the probability that inferences unfavorable to the accused will be drawn by the jury. United States v Maloney, supra. To offset that eventuality, it is incumbent upon the law officer in every case to inform the jurors they will not draw any such inferences. The presence or absence of this instruction, however, is chiefly material in determining whether the witness' claim of privilege operated to prejudice the accused. Its absence immediately strengthens the defendant's cause on appeal, although its utilization is not sufficient to overcome the prejudicial effect of error in every case.

185

Compare United States v Shaughnessy, 8 USCMA 416, 24 CMR 226, with United States v Grant, 10 USCMA 585, 28 CMR 151. As we said in United States v Shepherd, 9 USCMA 90, 25 CMR 352, at page 95:

> "Instructions by the law officer to the court-martial to disregard inadmissible evidence and erroneous actions by counsel may, in some situations, effectively eliminate the possibility of prejudice to the accused. . . . Under other circumstances, a cautionary instruction is insufficient to overcome the adverse impact of the evidence upon the court members. . . . There is no hard and fast rule in any particular case, but the general rule is that the accused must be accorded a fair trial."

We adhere to this belief, and while we hold it was incumbent upon the law officer to advise the members of the court to disregard the witness' claim of privilege and to draw no inferences adverse to the accused therefrom, we cannot say that its omission was prejudicial *per se*. Thus, we prefer to measure the effect of its presence or absence in the light of the error it seeks to overcome rather than accord to it the effect of a meaningless ritual. United States v Maloney, supra; United States v Shepherd, supra.

Left for determination is the question whether the trial counsel's improper examination of Lyons and the law officer's failure to give a curative instruction affected the substantial rights of the accused. It is certain that the errors cited had that result. The court members were permitted to hear Lyons repeatedly refuse to testify. As the accused was charged with acting in conjunction with that witness, there is a fair risk they inferred from Lyons' silence that both were guilty of participation in the larceny. The probability that such an inference would be drawn was accentuated by the failure of the law officer to give proper instructions. Prejudice is therefore apparent, and reversal is required.

The board of review is reversed and the record of trial is returned to The Judge Advocate General of the Army. A rehearing may be ordered.

Chief Judge QUINN concurs.

LATIMER, Judge (concurring):

I concur.

In joining with my associates, I consider it worthwhile to elaborate slightly on the issue of prejudice. Undoubtedly trial counsel's tactics in pursuing a line of questioning to which a witness was claiming a privilege would cause any reasonable person to infer the answers, if given, would be favorable to the prosecution. That inference would add to the strength of the Government's case and corroborate facts found in accused's confession over which there was an issue of involuntariness. Accused testified on that question, and the stronger the independent evidence of guilt, the greater the probability the court-martial would give no credence to the testimony of the accused.