UNITED STATES, Appellee

v

MARCUS M. MARYMONT, Master Sergeant,
U. S. Air Force, Appellant

11 USCMA 745, 29 CMR 561

No. 13,906

Decided August 5, 1960

*Lieutenant Colonel Philip J. Williamson* argued the cause for Appellant, Accused. With him on the brief was *Lieutenant Colonel James L. Kilgore.*

*Major John C. Wiley* argued the cause for Appellee, United States. With him on the brief were *Colonel John F. Hannigan, Lieutenant Colonel Francis R. Coogan,* and *Lieutenant Colonel Merlin W. Baker.*

## Opinion of the Court

HOMER FERGUSON, Judge:

The accused was found guilty of premeditated murder, in violation of Uniform Code of Military Justice, Article 118, 10 USC § 918, and adultery, in violation of Code, supra, Article 134, 10 USC § 934. He was sentenced to dishonorable discharge, forfeiture of all pay and allowances, and confinement at hard labor for the term of his natural life. Intermediate appellate authorities affirmed, and we granted accused's petition for review on several issues, only some of which require discussion.

On June 9, 1958, the accused's wife, Mary Helen Marymont, died in a United States Air Force Hospital in Sculthorpe, England. The circumstances of her death led attending physicians to suspect that it resulted from poisoning, and it was decided to conduct an autopsy. The accused initially agreed to the post-mortem examination but later asked if it could be avoided. The examination was nevertheless conducted and resulted in the discovery in the body of a lethal dose of arsenic. Expert testimony established that the arsenic caused Mrs. Marymont's death. The autopsy disclosed that she also had ingested the same poison on two prior occasions, each of which was estimated to have been some months prior to the third and fatal dose.

Commencing in 1956, the accused engaged in a meretricious relationship with a Mrs. Cynthia Taylor, a British national separated from her husband. During the ensuing period, Marymont spent frequent week-ends at the home of Mrs. Taylor's mother in which the daughter and her son also resided. During 1957, Mrs. Taylor and the accused often discussed marriage and appellant promised to marry her as soon as she was able to divorce her husband. It was contemplated that this would occur in December 1958. Mrs. Taylor was not aware that accused was married until after Mrs. Marymont's death. Accused gave Mrs. Taylor several valuable gifts and introduced her as his fiancée. The gifts included a ring designed to allay neighbors' suspicions of their relationship. The parties also corresponded regularly, and accused openly announced to his superiors that he desired to marry Mrs. Taylor "if he could get everything straightened out." In April 1958, Mrs. Marymont discovered the existence of accused's affair. A stormy scene with her husband followed. However, it was decided that separation was not the proper

remedy. Accused promised to try to abandon his extramarital adventure.

During May 1958, accused entered a chemist's shop and asked whether it stocked arsenic. Upon being informed that a police permit was required for the chemical's purchase, he said, "Oh, all right," and left. During the same month, accused, wearing an armband indicating that he was a duty noncommissioned officer, entered the chemistry classroom of the local Air Force branch of the University of Maryland. He asked the janitors why the building was lighted so late in the evening. After receiving some explanation, Marymont approached a shelf of chemicals in the classroom and remarked, "Oh that is a lot of chemicals on that shelf . . . Even arsenic." The shelf indeed contained a bottle of arsenic. It had not been used in any experiments and, at the time of its eventual seizure by criminal investigators, seemed to contain roughly the same amount as when first purchased from the laboratory. The classroom also contained a box of empty gelatin capsules. The premises were open and easily available to the accused who occasionally performed duties nearby.

On June 8, 1958, the deceased, the accused, and eight other people had dinner with English friends in Kings Lynn. After accused and his wife returned home, she became violently ill. No other person who attended the dinner was similarly affected. At approximately 11:00 p.m., accused obtained some medicine from the hospital for her. During the morning of June 9, accused's officer in charge visited his quarters at accused's request. He suggested that accused have his wife receive medical attention and offered to assist officially in seeing that this action was taken. Accused's testimony indicates that his wife declined to go to the hospital and that her condition seemed to improve during the morning. By approximately 2:00 p.m., however, she had again become quite ill, and her skin turned blue. Marymont declared that he attempted to render first aid and called for medical assistance. At approximately 2:30 p.m., Mrs. Marymont was examined at the station hospital to which she had been taken by ambulance. It was noted that she was suffering from an extreme loss of body fluids, a condition which had been developing over many hours. Her pulse was undetectible and the attending physician was of the opinion that she was then in a condition of irreversible shock. Despite immediate treatment, she died at 9:47 p.m. Arsenical poisoning was suspected, and the aforementioned autopsy confirmed its existence. The accused was the last person to give his wife food or drink prior to her death. An expert pathologist testified that the deceased probably received the final and fatal dose of arsenic within an hour of the commencement of her illness on the preceding evening. He also was of the view that she had been so seriously ill for a period of several hours prior to her hospitalization that a person without medical training would have been able to detect the severity of her ailment.

An authorized search of accused's quarters resulted in the discovery of empty gelatin capsules similar to those found in the University of Maryland classroom. An authorized search of his office desk turned up over sixty letters from Mrs. Taylor to him.

I

The first issue before us is whether the charges of adultery and premeditated murder were misjoined. We note that defense counsel made no objection at the trial to accused's arraignment on both charges, although the trial counsel expressly asked whether there were any preliminary motions to be made prior to accused's plea. It is obvious, therefore, that accused, by stating through his counsel that he had no motions to make and by affirmatively entering pleas of not guilty to both charges and their specifications without entering any objection to his trial on the charges, effectively waived any error involved in their joint trial. United States v Dial, 9 USCMA 700, 26 CMR 480; United States v Dyche, 8 USCMA 430, 24 CMR 240; United States v Bouie, 9 USCMA

228, 26 CMR 8. That counsel were aware of the possibility the charges should not be tried together is established by accused's pretrial objection to their joinder. Thus, the failure to pursue the matter at trial indicates a deliberate choice of tactics from which we should not grant relief at this level. Rather than decide the issue, therefore, we hold that the course of the accused's defense before the court-martial precludes any relief to which he might otherwise have been entitled.

II

The second question presented is whether the law officer erred in receiving in evidence a large number of romantic missives from Mrs. Taylor which were discovered in the accused's office desk. The defense objection was based solely upon relevancy and competency. Thus, it was contended that letters written by Mrs. Taylor tended only to establish the frame of mind of the author and not that of the accused and, in any event, they constituted no more than hearsay declarations. We also note that the law officer, in receiving the exhibits, advised the members of the court-martial that the letters might only be considered with respect to the charge of murder, as bearing on the accused's motive, and might not be viewed as establishing the truth of the matters set forth therein. The letters themselves disclose the amorous relationship between the parties and Mrs. Taylor's desire to marry the accused.

It is quite clear that Mrs. Taylor's letters are relevant to establish that she reciprocated accused's feelings of love for her and thus, to demonstrate the existence of a motive for the slaying of his wife. Rather than being too remote, in the sense of having probative value, the communications show a long continued liaison with Mrs. Taylor, the legitimation of which depended upon the ending, by one means or another, of accused's marital status. Thus, we disagree with counsel's conclusion that the letters did not bear upon the elements of premeditated murder, and pass to the question of their competency.

The Government contends that the letters were admissible under an exception to the hearsay rule permitting proof of statements of motive or intent. Thus, they advert to the rule laid down in paragraph 142d of the Manual for Courts-Martial, United States, 1951. The Manual rule offers no support for the Government argument, however, for the cited paragraph provides:

". . . If a statement made under circumstances not indicative of insincerity discloses a relevant and then existing motive, . . . *of the person who made the statement*, evidence of the statement is admissible for the purpose of proving the motive, . . . so disclosed.

. . . . .

"It should be noted that the above rule . . . does not authorize proof of a person's motive . . . *by evidence of a disclosure thereof made in another person's statement*." [Emphasis supplied.] [Manual, supra, paragraph 142d.]

It is clear that the only relevance of the letters in question is their disclosure of the accused's guilty passion for Mrs. Taylor and the esteem in which she held him. Thus, it would seem that the Manual rule is applicable and that the letters should have been excluded. Nevertheless, there is another sound basis for their receipt. As Dean Wigmore notes, letters from a third party found in the possession of a defendant, if relevant, are admissible on the basis that their continued custody justifies an inference that the defendant's attitude is at least favorable to the statements contained therein. Wigmore, Evidence, 3d ed, § 1073. That rule has been held expressly applicable to letters written by a paramour to one accused of his wife's murder. Wharton's Criminal Evidence, 12th ed, § 250, page 578; State v Butts, 107 Iowa 653, 78 NW 687 (1899); State v McFarland, 83 NJL 474, 83 Atl 993 (1912).

Finally, we note that the accused, taking the stand in his own defense, identified the letters as being those which he had received from his paramour and acknowledged that he had been in

749

love with her for at least two years preceding his wife's death. Thus, even if we were to assume that the communications should not have been received, a conclusion which we emphatically reject, we would be hard put to find any prejudice in their use to establish the very fact which accused judicially admitted. United States v Trojanowski, 5 USCMA 305, 17 CMR 305. Accordingly, we conclude that the issue with regard to the letters presents no cause for reversal.

## III

The third issue which we consider is whether the law officer erred to accused's prejudice in compelling him to testify concerning his sexual relations with Mrs. Taylor. The question is raised by the following portion of accused's cross-examination after he had elected to testify with respect only to the murder charge:

"Q. Do you admit having sexual relations with Mrs. Taylor.

"IDC: We'd like to raise an objection to this. This goes to the additional charge, and while the relationship is material—whether the accused had sexual relations with Cynthia Taylor, surely doesn't have any bearing.

"TC: If the court please, I think it most certainly has a bearing. The court has been instructed they cannot consider testimony with respect to the additional charge.

"DC: We feel, however, that this is the type of thing the court cannot disregard.

. . . . .

"LO: I am going to overrule the objection. I'm going to instruct the court again that Prosecution Exhibit 110 has been admitted only with respect to the charge and specification. That was the last exhibit. I again remind the court that it may not consider the testimony of the accused with respect to the additional charge and its specification, but may consider it as testimony only with respect to the charge and the specification. With that caution, you may proceed.

"Q. Sergeant, do you admit having had sexual relations with Mrs. Taylor from before Christmas 1956 through May of this year?

"A. Yes, sir, I do."

Immediately thereafter, trial counsel sought to ascertain if accused knew that Mrs. Taylor was married when he met her. An objection was interposed and sustained by the law officer.

Under military law, the accused has an absolute right to appear as a witness on his own behalf. If he limits his testimony to less than all of the charges against him, he may be cross-examined only concerning those offenses about which he does testify and his credibility. He may not be cross-examined with respect to those offenses charged concerning which he does not testify. Manual, supra, paragraph 149b; United States v Kelly, 7 USCMA 218, 22 CMR 8; United States v Hatchett, 2 USCMA 482, 9 CMR 112. In United States v Johnson, 11 USCMA 113, 28 CMR 337, we recently reviewed the right of the trial counsel to cross-examine an accused. In that case, the accused was charged with two desertions, absence without leave, and disobedience of a straggler order. He elected to testify only with respect to the offense of disobedience. He recounted on direct examination the circumstances surrounding the disobedience of the order and ended with the declaration that " 'I went over the hill again the next day.' " On the basis of that statement, the trial counsel cross-examined the accused with respect to his resultant desertion. We concluded that the accused's "incidental and natural reference to his second absence" was insufficient to confer upon the Government the right to cross-examine him with respect to an offense concerning which he elected to remain silent. United States v Johnson, supra, at page 115. In the instant case, the accused also expressly elected to remain silent with respect to the charge of adultery. He limited his testimony solely to the murder charge. Indeed, the entire direct examination consisted of only five questions and answers. They related to whether accused had ever attempted

to purchase arsenic; whether he had administered arsenic to his wife; whether he had applied for an extension of his overseas tour on the day after his wife's death; and the reasons for the requested extension. It is clear, therefore, that there is no basis here for the argument that the accused voluntarily extended his testimony to the offense of adultery.

The Government argues, however, that the accused's relations with Mrs. Taylor tended to establish a motive for the murder of his wife. From this premise, it is reasoned that it was permissible for the trial counsel to establish acts of intercourse between Marymont and his paramour. Absent the charge of adultery, this contention is undoubtedly correct. Nevertheless, the relationship which the Government claims to have constituted accused's motive was in fact made the basis of a separate count. While joinder of criminal charges is permissible in trials by court-martial, the process may also have the effect of limiting the rights which the Government might otherwise possess. Separate and distinct offenses may never be combined in such a manner that the accused, merely because of the charges against him, is hampered or embarrassed in the presentation of his defense. Finnegan v United States, 204 F2d 105 (CA 8th Cir)(1953); United States v Lotsch, 102 F2d 35 (CA 2d Cir)(1939). If the Government's position here is correct, this basic principle has little validity, as its contention means that accused's right to remain silent with respect to one or more of the offenses charged vanishes upon the showing of an incidental connection between it and the crime concerning which he desires to speak. Cf. United States v Johnson, supra. In short, if, as here, an accused is charged with both murder and adultery, the fact that the latter offense bears in any way upon the former means that the defendant must be willing judicially to confess the lesser crime in order to defend against the greater. We do not believe the Government's privilege extends so far. Where it has chosen to make the motive for a murder the subject of a

separate count, it must be held to have foregone its right to cross-examination with respect to that count unless, of course, the accused voluntarily extends his testimony to its allegations. It follows that the trial counsel erred when he extended his interrogation of Marymont to the question whether sexual relations occurred between the parties. In this connection, we note that his questions went precisely to the period of time alleged in the adultery specification and that he subsequently sought to elicit information concerning whether accused knew Mrs. Taylor was married. Thus, we are not at all certain whether he was using the argument of motive in order deliberately to obtain proof of guilt of the adultery specification.

It is next contended that the law officer's instruction to the court that it might consider the evidence of accused's relations with Mrs. Taylor only with respect to the murder charge is sufficient to purge any prejudice involved. We have heretofore pointed out that the effect of such an instruction must be judged according to the circumstances of the particular case. United States v Bolden, 11 USCMA 182, 28 CMR 406; United States v Shepherd, 9 USCMA 90, 25 CMR 352. Here, we are certain the advice was insufficient to overcome the prejudice to the accused. As noted above, the trial counsel's question dealt directly with the period of time alleged in the specification charging adultery. Although the next question, relating to whether accused knew Mrs. Taylor was married, was not permitted, the mere fact that it was asked served to emphasize to the members of the court that accused was judicially confessing to the Additional charge. To believe that they could thereafter wipe the evidence from their minds when considering the question of accused's guilt of adultery is to disregard the obvious and calculated effect of the forbidden questions. Human nature does not change merely because it is found in the jury box. People v Deal, 357 Ill 634, 192 NE 649; United States v Grant, 10 USCMA 585, 28 CMR 151. We conclude, therefore, that the erroneous cross-examination of the accused

requires reversal of the findings of guilty concerning adultery. It does not, however, affect the findings of guilty of premeditated murder, for, as hereinbefore noted, the absence of the Additional Charge would have permitted the fullest inquiry into accused's relationship with his paramour on the basis of establishing motive.

## IV

The next issue before us needs no extended discussion. The question presented is whether the evidence is sufficient in law to support the findings of guilty of murder and adultery. In view of our disposition of the last-mentioned charge, we need not concern ourselves further with the adequacy of its proof.

With respect to the murder charge, the evidence establishes that Mrs. Marymont met her death from arsenical poisoning. The only possible question of sufficiency is whether the Government demonstrated that accused was the guilty agent. We believe the circumstances shown in this record offer a proper predicate for the court's finding that he was. Thus, the Government showed that the accused was engaged in an extramarital affair with Mrs. Taylor, who was not aware that he was married, and had promised to legitimize their relationship when she obtained a divorce. That event was expected to occur within a few months. Accused was also identified as one who had sought to purchase arsenic a few weeks prior to his wife's death and as one who knew that arsenic and empty gelatin capsules were freely available in the University of Maryland chemistry laboratory. Capsules similar to those in the laboratory were found in his home. Although the experts were of the view that the seriousness of his wife's illness must have been apparent for several hours prior to the notification to the hospital, he delayed summoning an ambulance until she was *in extremis*. True it is that he sought to explain the delay by stating that his wife was adverse to seeking medical aid. In view of the other evidence,

however, the court members were entitled to reject that explanation, and we cannot say that they erred when they did so. In short, our review of the record involves only the legal sufficiency of the evidence. United States v Brand, 10 USCMA 437, 28 CMR 3. Scrutiny of the testimony in this case convinces us that the findings of guilty with respect to premeditated murder are fully supported.

## V

Accused also argues that his pretrial statement was inadmissible with respect to the adultery charge, as he was not made aware of the nature of that accusation at the time of his interrogation and that there is insufficient proof in the record to corroborate the admissions which it contains. In view of our disposition of the case, it is unnecessary for us to reach these questions.

While accused's case was pending before this Court, a petition for new trial was forwarded to us, alleging that accused was entitled to another hearing on the basis of newly discovered evidence. We have carefully reviewed the affidavits offered in support of the petition and find that they are substantially cumulative of matters presented at the trial. Moreover, it does not appear that any of the information contained therein constitutes newly discovered proof. Hence, the petition must be denied, and it is so ordered.

Finally, out of an abundance of caution, we have scrutinized the entire record to determine whether accused's rights were prejudiced in any respect other than as hereinbefore noted. With the one exception of his cross-examination on the offense of adultery, we are satisfied that he received a fair hearing. That error, however, requires only dismissal of the Additional Charge and its specification. With respect to the question of punishment, it is clear that there need be no re-examination of the sentence by the board of review. The law officer properly instructed the court-martial that the maximum penalty for the offenses of which the accused had been convicted was death. The

752

court imposed the minimum punishment for premeditated murder, *i.e.*, life imprisonment. Consideration of the authorized sentence for adultery—dishonorable discharge, forfeiture of all pay and allowances, and confinement at hard labor for one year—thus fades into insignificance. The same factors apply to the affirmance of the sentence before the board of review. It affirmed a punishment of dishonorable discharge, forfeiture of all pay and allowances, and confinement at hard labor for life. Faced with approved findings of guilty of murder and that sentence, the possibility that it was affected in its assessment of appropriateness by the offense of adultery and the one year penalty is little more than fanciful. Under the law of this Court, it must be held that the effect of the error is *de minimis*. United States v Horowitz, 10 USCMA 120, 27 CMR 194; United States v Jones, 10 USCMA 122, 27 CMR 196. Accordingly, we may dispose of the matter at this level by dismissing the adultery charge.

So much of the board of review decision as affirms findings of guilty of the Additional Charge and its specification is reversed. The Additional Charge and its specification are ordered dismissed. Otherwise, the decision of the board of review is affirmed.

Chief Judge QUINN concurs.

LATIMER, Judge (concurring in part and dissenting in part):

I concur in part and dissent in part. Were it not for the fact that this decision announces bad law, I would not, in light of the disposition ordered, bother to outline my position. Certainly, insofar as this accused is concerned, our discussion of the issue that divides the Court is unimportant and academic, for he ends up precisely where he started. However, we make law for application in subsequent cases, and I, therefore, deem it appropriate to set forth my views briefly.

While I concur generally with the other concepts announced, I dissent from that portion of the opinion which holds that error was committed by the law officer when he permitted the prosecution to cross-examine the accused on the adulterous relationship with his paramour. I believe it to be a well-established rule of evidence that an accused cannot take the stand on his guilt or innocence of one particular offense and thereafter bar cross-examination on matters going directly to the essential elements of that crime or those affecting his credibility. This is so even though the evidence tends to prove the commission of a separate offense. Certainly, the Court's holding in United States v Johnson, 11 USCMA 113, 28 CMR 337, is not an authority for excluding evidence which is relevant to the charge upon which the accused testified. In that instance, we were considering whether the accused waived his limitation by volunteering evidence which touched on both specifications, and here I do not contend the accused opened the door on the adultery charge. In fact, the law officer specifically instructed the court that evidence could not be used to support a finding on the latter crime, and obviously accused's testimony could not be considered a judicial confession of adultery. As a matter of law, it cannot be used for that purpose. But that is not to say the accused can lower the bars on one specification and then keep out evidence which is competent and relevant to that offense merely because he contends it invades a field declared off limits by him. His limitations do not extend to the crimes upon which he testifies, and in that connection the present majority opinion seems to concede that evidence of meretricious relationship by a spouse is competent and material in a murder case involving the other party to the marriage contract. Indeed, such a concession is understandable, for as Dean Wigmore states, in discussing motives for murder:

> "Circumstances involving the *sexual passion*, in one aspect or another, and usually operating through the emotion of jealousy, may lead to a desire to kill: . . ." [Wigmore, Evidence, 3d ed, § 390.]

Nor is it of consequence that establishing motive involves other criminality. As Wigmore states in § 389 of his treatise, supra:

"The *criminality* of the circumstances involved in proof of the motive has no doubt often been the ground of objection, the character-rule (*ante*, § 194) being invoked in exclusion. But it has already been seen (*ante*, § 216) that the fact that the circumstance offered involves also *another crime* by the defendant charged is in itself no objection, if the circumstance is relevant for the present purpose."

And the following rule set forth in Underhill, Criminal Evidence, 5th ed, § 644, is particularly applicable in the case at bar:

". . . The existence of an improper intimacy, or illicit or incestuous connection, or an infatuation, may always be proved to show a motive, when the defendant is charged with the homicide of a person whose existence was an obstacle to the complete gratification of his wrongful desires."

Yet the evidence in the case at bar, despite its pertinence to the murder charge, is held to be incompetent even though the accused announced he was to be a witness on his own guilt or innocence of that crime, and the law officer charged that the evidence could be considered only as to that offense. As I understand my brothers' concept, the testimony would be competent had the accused not been charged with adultery, but the filing of charges on that offense throws a cloak of protection around him. I cannot agree. It is indeed a new and unique rule that an offender may, by committing two crimes, change the rules of evidence or, in the alternative, prevent the prosecution from bringing him to the bar of justice for one of his delicts. Had the Government followed the rule my associates are apparently laying down and brought accused to trial separately on the adultery charge, I strongly suspect he would then claim charges had been saved up and invoke the rule that he could not be tried for that crime because all known offenses should be referred to trial together.

Finally, I can find no support for my associates' suspicion regarding the period of time mentioned in trial counsel's question. I merely invite attention, in light of the above-quoted authorities, to the fact that the inquiry established that the accused's motive existed at least through May of 1958, and his wife died of poisoning on June 9 of that year.

Accordingly, I find no basis for reversing the conviction for adultery, and I would affirm the decision of the board of review in its entirety.