UNITED STATES, Appellee

v

CHARLES P. BATTISTA, Lieutenant, U. S. Naval Reserve (On active duty), Appellant

14 USCMA 70, 33 CMR 282

No. 16,496

May 31, 1963

*Myron G. Ehrlich, Esquire,* argued the cause for Appellant, Accused. With him on the brief was *Lieutenant Colonel M. G. Truesdale,* USMC.

*Commander Benjamin H. Berry,* USN, argued the cause for Appellee, United States. With him on the brief was *Major Daniel F. McConnell,* USMC.

### Opinion of the Court

FERGUSON, Judge:

A general court-martial convened by the Commander, U. S. Naval Forces, Japan, found the accused, a dental officer, guilty of three specifications of wrongfully and indecently inducing certain named seamen, who were then under the influence of drugs, to disrobe in his presence and pose in the nude for photographs, in violation of Uniform Code of Military Justice, Article 133, 10 USC § 933, and of sodomy, in violation of Code, supra, Article 125, 10 USC § 925. He was sentenced to dismissal from the service, forfeiture of all pay and allowances, and confinement at hard labor for two years. The convening authority approved the sentence, and the board of review affirmed. We granted accused's petition for review on the issue whether a search of his stateroom and seizure of certain items therefrom was lawful.

A dental patient—named as victim in the sodomy specification—reported that,

while he was semiconscious from drugs purportedly administered for the purpose of treatment, Lieutenant Battista caused him to engage in two acts of fellatio. The matter was referred to the Office of Naval Investigations. Agents of that organization were also made aware of the complaint of another sailor that accused had attempted to administer an anesthetic to him after making sexually suggestive remarks. After proper warning under the provisions of Code, supra, Article 31, 10 USC § 831, accused was interviewed. According to the agents, he was "very evasive" and refused them permission to search his stateroom.

The agents consulted the Captain of accused's ship, made known the foregoing matters to him, and requested his permission to search the ship dental office and accused's stateroom to see if they could find "some evidence of a homosexual nature, pornographic literature, names, and correspondence." The purpose of the search was to, if possible, uncover something "of a nature that would suggest homosexuality. Pictures of nude men, things of that nature." It was "standard procedure." The Captain authorized the search of the dental office and the stateroom.

The agent's examination of the dental office turned up nothing which was admitted in evidence at the trial. In accused's stateroom, however, various photographs and cartridges of undeveloped film were discovered, the latter being subsequently developed and printed. Despite defense counsel's objections on proper grounds, these were introduced in evidence for the limited purpose of establishing accused's guilt of Charge I and its specifications. They were identified by the various persons named in the specifications as nude photographs of themselves, apparently taken without their permission while they were drugged and ostensibly being treated by Dr. Battista. One photograph, in particular, depicts a nude, comatose male seated in a dental chair with an anesthetic mask on his face.

We pause at the outset of our inquiry to note that the commanding officer of a naval vessel undoubtedly has the authority to order a search of his ship when the interests of safety and security demand it. See United States v Harman, 12 USCMA 180, 30 CMR 180; United States v Brown, 10 USCMA 482, 28 CMR 48; and Frank v Maryland, 359 US 360, 3 L ed 2d 877, 79 S Ct 804 (1959). But, as the dissenting member of the board of review noted, that situation is not involved here and is clearly to be distinguished from the commander's right to order a search of the personal effects of a member of his crew as part of an investigation into a suspected offense. United States v Brown, supra, at page 489.

As we noted in the *Brown* case, the grant of authority by a commanding officer to search the quarters or personal effects of an individual must be based upon probable cause. Absent a demonstration to him of such cause, he cannot lawfully permit such action. Jones v United States, 362 US 257, 4 L ed 2d 697, 80 S Ct 725 (1960). Here, there was no such probable cause. The agents had no reason to believe that Dr. Battista had possession of any instrumentalities of his crime, its fruits, or other proper objects of a search. Gouled v United States, 255 US 298, 65 L ed 647, 41 S Ct 261 (1921); United States v Lefkowitz, 285 US 452, 76 L ed 877, 52 S Ct 420, 82 ALR 775 (1932). The search was simply instituted for the purpose of securing evidence with which to convict the appellant of sodomy. A general exploratory search for matter which is not directly connected with the commission of a suspected offense is forbidden. Go-Bart Importing Co. v United States, 282 US 344, 75 L ed 374, 51 S Ct 153 (1931); Nathanson v United States, 290 US 41, 78 L ed 159, 54 S Ct 11 (1933); United States v Vierra, 14 USCMA 48, 33 CMR 260.

According to the agents, they obtained authority to search accused's stateroom only because it was "standard procedure" to do so, and accused had been "very evasive" during their interview with him. They had no idea what they might find, but believed that

evidence of a "homosexual nature" would be uncovered. Their reasons were purely intuitive, and not the slightest factual basis was offered to the commander for the proposed examination of accused's effects.

Their quest was purely an exploration of accused's effects in the hope of obtaining proof of his guilt, without any knowledge of what it might be or that accused was in possession of it. These matters were boldly admitted by the agents in their testimony, in which they frankly stated seeking "some evidence of a homosexual nature," with which to secure the conviction of Lieutenant Battista for sodomy. Patently, this was not a search for the fruits of a crime, its instrumentalities, or any other proper object of search. Here, as in United States v Lefkowitz, supra, the search was "exploratory and general and made solely to find evidence of respondents' guilt of . . . crime." It was, therefore, illegal, and the law officer erred in admitting the films and photographs in evidence. Go-Bart Importing Co. v United States, supra; Gouled v United States, supra; United States v Lefkowitz, supra.

The photographs furnished direct evidence of accused's guilt of Charge I and its specifications. Hence, it is obvious that the findings of guilty regarding these counts must be set aside. While the law officer expressly limited consideration of the pictures to Charge I and its specifications and pointed out to the court that they were not admissible on the sodomy charge, it cannot be said in this case that the limiting instructions were sufficient to eliminate a fair risk of prejudice.

Whether limiting instructions or advice to disregard certain evidence are effective to overcome the harmful consequences of an otherwise prejudicial error depends upon the circumstances of the individual case. See United States v O'Briski, 2 USCMA 361, 8 CMR 161; United States v Patrick, 8 USCMA 212, 24 CMR 22; United States v Grant, 10 USCMA 585, 28 CMR 151; and United States v Justice, 13 USCMA 31, 32 CMR 31. As to the sodomy charge, it is expecting too much of the fairest-minded court members to have them ignore in their deliberations photographs of the nature involved here. Because of his drugged condition, accused's victim, in the words of the board of review, "had a very sketchy recollection of what occurred on the . . . visit to the dentist's office." As noted above, one of the photographs involved in the initial charge depicts a nude, apparently drugged sailor seated in a dental chair, wearing an anesthetic mask on his face. The picture is almost precisely corroborative of the details of the victim's recital of accused's sordid and disgusting behavior. In light of this photograph, as well as the accused's possession of others portraying various males in the nude, it is impossible to ignore the fair probability that the court was influenced in its consideration of Charge II and its specification by these inadmissible items. United States v Grant, supra; cf. United States v Warren, 6 USCMA 419, 20 CMR 135. We conclude that this charge also must be set aside.

Having thus found specific prejudice to flow from the admission of the illegally seized evidence, we need not concern ourselves with the problem whether breach of accused's constitutional protection against unreasonable searches and seizures in itself entitles him to reversal. Cf. Kotteakos v United States, 328 US 750, 764, 90 L ed 1557, 1566, 66 S Ct 1239 (1946); United States v Justice, supra, at page 48; United States v Vierra, supra.

The decision of the board of review is reversed, and the record of trial is returned to The Judge Advocate General of the Navy. A rehearing may be ordered.

Judge KILDAY concurs.

QUINN, Chief Judge (concurring in part and dissenting in part):

I am sure the authority of the Captain of a ship to order a search of areas assigned to particular personnel is broader than indicated in the principal opinion. See Frank v Maryland, 359 US 360, 3 L ed 2d 877, 79 S Ct 804,

pet reh den, 360 US 914, 3 L ed 2d 1263, 79 S Ct 1292 (1959); United States v Harman, 12 USCMA 180, 30 CMR 180; cf. United States v Blok, 188 F2d 1019 (CA DC Cir) (1951). However, I agree with the conclusion that a search of the accused's stateroom for possible evidence of a crime was unjustified. I, therefore, join in setting aside the finding of guilty of Charge I and its specifications. As far as the sodomy charge is concerned, different considerations apply.

None of the photographs related to that offense. And the court-martial was specifically instructed that it could consider the exhibits only with regard to the specification to which each applied. It was also instructed that a finding of guilty "of any specification, must not be used . . . in determining the guilt or innocence" of the accused as to "any other specification."

The victim testified directly and unqualifiedly to the accused's commission of the act upon his person. While he admitted he was under sedation at the time and he could not recall all that happened in the dental office, he testified to the act and to other matters with a certainty of detail that was significantly corroborated by the accused in his own testimony. The patient testified that when in the dental office with the accused he engaged in a discussion on sex, and he told the accused he had had an abnormal experience when he was about eight years of age; the accused admitted that a conversation with the patient, which started with a discussion about schooling, "drifted" into that area. The patient also testified the accused asked if he had ever performed an autosexual act; the accused admitted he "might have" asked such a question. The patient said that on leaving the dental office the accused asked him if he "could make it back to sickbay O.K."; he said he thought he could, but he recalled that on the way back he "crash[ed] against the bulkheads." The accused admitted he "walked behind" the patient while he made his way to the sick bay because the patient "was stumbling, bouncing, bulkhead to bulkhead." Significantly, he did not say he attempted to help the patient in

any way. The accused further testified that if aroused the patient would know "what is going on around him," but if left alone would, as a result of medication administered to him, "probably lapse right back into a drowsy sleep."

Other important evidence bears upon this offense. The patient's clinical record shows, and the accused admitted, he took the patient, who was under the influence of drugs the effect of which would normally "last all night," from the sick bay to the dental office at about 1:00 a.m. The clinical record shows the purpose of the visit was "for examination," but the accused testified that in the course of a regular routine check on the patient he found "a very large blood clot in his mouth." In the office he "remove[d] the blood clot and rinse[d] . . . [the patient's] mouth out"; after this treatment, he put "some tannic acid on the wound." The patient's clinical record contains no entry of such treatment. No report of the treatment was made to the corpsman on duty and the "Doctor's Progress Notes," part of the clinical record signed by the accused, show only that he visited the patient several times during the night to see if he "was progressing satisfactorily" and on "each occasion" he merely "encouraged" the use of an ice pack to "control edema and pain." There is no mention whatever of the finding of a blood clot, or of the removal thereof. Also, the accused testified that the purported removal of the clot took about ten minutes; but despite the fact that the drug-induced condition of the patient was such that he would tend to go to sleep if there were "no outside stimulants," the patient engaged him in conversation for about another twenty minutes. Finally, the accused testified the patient asked for, but he did not give him, a prescription for demerol, which is a narcotic; later, however, he "made a prescription out in the ward, and . . . left it on" the patient's chart. The medical clerical corpsman on duty in the sick bay testified the doctor "did not come into the ward" when the patient returned to the sick bay; and that shortly after his return the *patient* gave him the prescription.

74

As indicated above there is much more present here than a half-remembered story by a person under the influence of sleep-inducing drugs and a consistent, straightforward denial of the commission of the offense by the accused. There is very substantial corroboration of the victim's account; and there are very glaring deficiencies in, and contradictions of, the accused's story. In the light of the evidence I find no fair risk that the court-martial, in disregard of the explicit instructions of the law officer, used the photographs to determine the accused's guilt of the sodomy offense. United States v Higgins, 6 USCMA 308, 20 CMR 24; Woods v United States, 240 F2d 37 (CA DC Cir) (1956); Heinecke v United States, 294 F2d 727 (CA DC Cir) (1961). In rejecting a contention of prejudice similar to that presented here, the Court of Appeals in the *Heinecke* case, at page 729, said:

> ". . . The evidence was introduced to support the count with regard to which it was offered, and in like manner was inspected by the jury. In the court's charge to the jury the offenses set forth in the indictment were classified into several groups and the jury was advised as to what evidence the government had offered in support of the counts within a group."

I would affirm the findings of guilty of the sodomy offense.