UNITED STATES, Appellee

v

GEORGE A. ASKEW, JR., Airman Third Class,
U. S. Air Force, Appellant

14 USCMA 257, 34 CMR 37

*Major William A. Crawford, Jr.,* argued the cause for Appellant, Accused. With him on the brief were *Colonel Daniel E. Henderson, Jr.,* and *Lieutenant Colonel Quincey W. Tucker, Jr.*

*Major James Taylor, Jr.,* argued the cause for Appellee, United States. With him on the brief was *Colonel Emanuel Lewis.*

## Opinion of the Court

FERGUSON, Judge:

Brought to trial before a special court-martial upon three specifications of larceny, in violation of Uniform Code of Military Justice, Article 121, 10 USC § 921, the accused was found guilty and sentenced to bad-conduct discharge and reduction. Intermediate appellate authorities affirmed, and we granted accused's petition upon issues concerning the admissibility of his confession and the president's instructions to the court on that subject.

I

The factual background of the controversy is uncomplicated. There is evidence in the record establishing that, on July 17, 1962, Airman McDaniel left a pocket transistor radio in his locker. Subsequently, he found it missing. Similarly, on July 20, 1962, an Airman Macklin left a sum in excess of $170.00 and seventeen British pounds in his locker. When he returned from work, he, too, discovered his property had been taken.

On July 31, 1962, accused, accompanied by Airman Newson, entered the Brize Norton Air Force Exchange. Newson went to the cigarette counter, while the acused "was up front, around the clothing department." Later, Newson saw accused in "the dressing room, where you change clothes." Askew left the Exchange with Newson and remarked that "he was fat." When they returned to their barracks room, Askew

"took off his fatigue jacket," and Newson noted that he was wearing "a brown suit coat" under it. Airman Walker entered the room and saw that accused "had on a pair of fatigue pants, a pair of gum boots and a suit coat tucked into his fatigue pants." Accused "told me that he had been to the PX early that evening and he had a suit—he took a couple of suits into the dressing room and he put this suit on and walked out." He further related to Walker that he did not pay for the clothing. Walker left the room in order to change clothing. When he returned, he saw the complete suit lying on a bed. The trousers were not cuffed.

On August 1, 1962, accused came under suspicion and, after proper warning, was interrogated by Sergeants Gray and Hunt, Air Police investigators, concerning the alleged larcenies. The questioning began at approximately 7:50 a.m., and was accompanied by an authorized search of Askew's personal belongings, which resulted in the seizure of a radio identical to McDaniel's; the suit of clothing taken from the Exchange; and some letters written to accused by his wife.

Following the search, the investigators continued to question accused concerning the thefts. According to Gray, accused orally admitted stealing the suit and radio, but denied taking Macklin's money. Gray read the seized letters, and "they indicated to me that

258

a previous question I had asked Askew, he hadn't been telling the truth."[1] Gray's testimony continues as follows:

"Q. Did you, or anybody else in your hearing, tell him that unless he was willing to clarify the apparent discrepancies between what was in the letters and what he told you previously it would be necessary to contact Mrs. Askew for a statement?

"A. That was just about the question. In other words, actually what I told him was words to the effect that in view of what I had learned there was a good possibility that we would have to contact the nearest air base to Cleveland, Ohio, and see if they could set up a liaison with the civilian police to see if they could have her interviewed.

"Q. Did the accused indicate to you that he was much opposed to this idea?

"A. He didn't want his wife to be contacted.

"Q. OK—could you tell us why?

"A. At this time he had made no mention of her pregnancy.

"Q. He then told you of his wife's pregnancy?

"A. He had not at this time.

"Q. Did he then?

"A. No, it was shortly after that that he did tell us, but not at that particular time.

"Q. Did he tell you that he didn't want her contacted?

"A. He didn't specify the reason. He just said he didn't want her brought into it.

"Q. Was it at your insistence [sic] then that she would have to be brought into it unless he cleared it up, and did you proceed along these lines of interrogation?

"A. I didn't particularly stress over and over again. I merely mentioned it during the interview and later on when he agreed to make a statement. Then I talked to him to make sure that he understood that regardless of whether he made a statement or not was no guarantee that we would not have to contact his wife.

"Q. But did you assure him more or less that you most likely would not have to if he cleared up the questions?

"A. I said we would not if there was any way we could avoid it. I told him that he was to understand the fact that we had mentioned contacting his wife was not to be mentioned in the report, and he agreed to make a statement and I said that if he made a statement it must be voluntary, and he said that he understood this and he agreed to do so.

• • • • •

"Q. It was not until after you introduced these letters into the conversation that he made any statement —incriminating statement—relative to Specification 3—that money was taken from Macklin?

"A. That's true.

"Q. So the letters were a factor in it, would you say?

"A. Yes, sir. I'd definitely say they were."

Gray declared he was not aware accused's wife was pregnant or ill until after the latter had executed his confession.

Accused testified on the issue of voluntariness. He denied having made any admission as to the larcenies until his wife's letters were introduced into the interview. At this point, the following allegedly occurred:

"They were reading my mail, and Sergeant Hunt said 'This is it; we've got what we want', real loud, and 'We had a TWIX [sic] from Cleveland and got what we needed'. Then they went back into the investigation room and Sergeant Hunt begain [sic] to explain, and he said 'I know why you did this' and 'I know why you did that' and 'I know how it is trying

[1] The letters were not placed in evidence, and the record does not directly reflect their contents. From the testimony and accused's statement, it may fairly be inferred that they concerned money which he had recently sent home to his spouse.

to stay off base and maintain a home', and he said that my wife would have to be contacted. I asked if I made a statement would my wife have to be contacted, and they said no, because they had just about all they needed, and he said there was no guarantee but more than likely there would be no necessity to contact my wife with regards to the incident as to why I was being held over here."

According to Askew, his wife was, at the time of his interrogation, pregnant and suffering from anemia. Her condition "had been bothering . . . [him] quite a good deal," and he did not wish her to be brought into the matter "if I could avoid it at all." In order to avert it, he confessed his guilt to Gray and Hunt.

The defense objection to receipt of the confession in evidence, on the ground that it was involuntary, was overruled, and the statement was ·duly considered by the court-martial.

## II

As the above resumé indicates, the evidence before us presents circumstances surrounding the taking of accused's statement in a two-fold—yet intertwined—aspect. There is proof that Gray, during a lawful search, obtained from accused's locker certain letters addressed to him by his wife and which apparently afforded him information upon which to base his ultimately successful interrogation. Indeed, Gray himself conceded that use of the letters was a definite factor in obtaining the confession.

The other aspect of the questioning is the alleged need to contact and question Askew's wife which grew out of information disclosed by the agent's scrutiny of the letters. According to the accused, he was informed such would most probably be unnecessary if he confessed, and he did so solely to avoid having his wife contacted. Indeed, we note the evidence indicates that Gray saw fit to emphasize to accused—after he agreed to make a statement—that there was "no guarantee . . . we would not have to contact his wife ♦ . . [but] we

260

would not if there was any way we could avoid it." And it is significant he also informed accused the matter "was not to be mentioned in the [police] report." Accused's testimony indicates he believed he had to accept this "half-guarantee" in order to avoid having Mrs. Askew, ill and pregnant, troubled by civilian police officers in her home city.

The initial question before us, therefore, is whether these controverted facts, involving the seizure and use of private correspondence between accused and his wife and an alleged promise not to have her interviewed by other police officers, present circumstances from which the fact finders could have inferred that Askew's statement was not voluntary. We think it clear that they place voluntariness in issue.

First, while the record establishes an authorized search of accused's belongings, it equally establishes a seizure of accused's private correspondence and its use during his interrogation. And it is made clear that these letters from his wife were neither instrumentalities nor fruits of any crime. Cf. Marron v United States, 275 US 192, 72 L ed 231, 48 S Ct 74 (1927). We have recently had occasion to delve at length into this problem and have heretofore set forth the principle that one's private papers may not be so seized.

Thus, in United States v Vierra, 14 USCMA 48, 33 CMR 260, Judge Kilday, with whom the author concurred, pointed out at page 53:

". . . In this regard, there is firmly recognized a category of property customarily characterized as 'mere evidentiary materials' which can never be made the subject of a lawful search and seizure. United States v Rhodes, 3 USCMA 73, 11 CMR 73; Harris v United States, 331 US 145, 154, 91 L ed 1399, 67 S Ct 1098 (1947); United States v Rabinowitz, 339 US 56, 64, 94 L ed 653, 70 S Ct 430 (1950). *This protection is secured within the provisions of the Fifth Amendment to the Constitution, for in legal contemplation such search and seizure of private books and*

*papers compels the owner to be a witness against himself by the most potent evidence—his writings and records.*" [Emphasis supplied.]

See also United States v Battista, 14 USCMA 70, 33 CMR 282.

We recognized the applicable concept, *i.e.,* that lawful searches must be limited to seizure of the fruits or instrumentalities of crime, as early as United States v Rhodes, 3 USCMA 73, 11 CMR 73, although, in that case, we found the questioned material to constitute a means by which accused committed his offenses. Nor is this guiding limitation a recent innovation in the law. It was considered by the Supreme Court in the landmark case of Boyd v United States, 116 US 616, 29 L ed 746, 6 S Ct 524 (1886), and has since been regularly applied. Gouled v United States, 255 US 298, 65 L ed 647, 41 S Ct 261 (1921); United States v Lerner, 100 F Supp 765 (ND Cal) (1951); United States v Rees, 193 F Supp 849 (DC Md) (1961). See also United States v DeLeo, 5 USCMA 148, 17 CMR 148; United States v Higgins, 6 USCMA 308, 20 CMR 24; United States v Starks, 23 CMR 476; and Department of the Army Pamphlet No. 27–172, Military Justice, Evidence, pages 354, *et seq* (1961). In accordance with these authorities, the president should have ruled the letters were illegally seized.

Secondly, there is no doubt that the evidence strongly presents the question whether the confession resulted from the officers' use of the missives. Thus, Gray testified they referred to the letters during Askew's interview and expressed the view that such contributed materially to the questioning. So also did the accused who testified at length to the agents' tactics and the fact that, conformably to the information thus obtained, his interrogators dwelt upon the need to have his wife questioned. A question was therefore presented for the fact finders concerning whether accused's statement was the fruit of the poisonous tree. United States v Haynes, 9 USCMA 792, 27 CMR 60; Silverthorne Lumber Co. v United States, 251 US 385, 64 L ed 319, 40 S Ct 182 (1920); Coplon v United States, 191 F2d 749 (CA DC Cir) (1951). As was stated by Mr. Justice Holmes in the *Silverthorne* case, supra, at page 392:

". . . The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the court, but that it shall not be used at all."

Intertwined with and growing out of the foregoing is the so-called "half-guarantee" allegedly made to the accused that, if he confessed his guilt, it would most probably be unnecessary to have his wife questioned by civilian police officers.

As early as 1952, this Court pointed out that, in order to be admissible in evidence, a "confession must be the product of free choice—of a will not encumbered or burdened by threats, promises, inducements, or physical or mental abuse." United States v Colbert, 2 USCMA 3, 6 CMR 3, at page 7. See also United States v Monge, 1 USCMA 95, 2 CMR 1; United States v Josey, 3 USCMA 767, 14 CMR 185; and United States v Acfalle, 12 USCMA 465, 31 CMR 51. The question to be decided, therefore, is whether, in light of the alleged inducement, accused possessed this mental freedom to speak or remain silent. United States v Acfalle, supra. In this area, there is no dearth of precedent.

Speaking in general terms, the Supreme Court recently declared:

". . . The controlling test is that approved in *Bram* [v United States, 168 US 532, 42 L ed 568, 18 S Ct 183 (1897)]: ' "a confession, in order to be admissible, must be free and voluntary: that is, . . . not . . . obtained by any direct or implied promises, however slight. . . ." ' . . . Evidence so procured can no more be regarded as the product of a free act of the accused than that obtained by official physical or psychological coercion." [Shotwell Mfg. Co. v United States, 371 US 341, 347, 9 L ed 2d 357, 83 S Ct 448 (1963).]

And in Rogers v Richmond, 365 US 534, 5 L ed 2d 760, 81 S Ct 735 (1961), the Court found voluntariness squarely placed in issue by defendant's testimony that he confessed because of threats of "bringing . . . [his] wife in for questioning, . . . unless he confessed and that in making this threat Chief Eagan told him that he would be 'less than a man' if he failed to confess and thereby caused her to be taken into custody." *Id.* at page 536. The police officers denied using such tactics. In remanding the case and affording the State an opportunity to relitigate the controverted issue under appropriate principles of law, the Supreme Court declared, at page 540:

"Our decisions under . . . [the Fourteenth] Amendment have made clear that convictions following the admission into evidence of confessions which are involuntary, i.e., the product of coercion, *either physical or psychological,* cannot stand. This is so not because such confessions are unlikely to be true but because the methods used to extract them offend an underlying principle in the enforcement of our criminal law: that ours is an accusatorial and not an inquisitorial system—a system in which the State must establish guilt by evidence independently and freely secured and may not by coercion prove its charge against an accused out of his own mouth." [Emphasis supplied.]

Similarly, in Culombe v Connecticut, 367 US 568, 6 L ed 2d 1037, 81 S Ct 1860 (1961), a case which thoroughly traces and develops the principles governing the use of allegedly coerced confessions, the Court unhesitatingly condemned police use of the defendant's wife "to confront her husband and tell him to confess." 367 US at page 630. Considering the totality of the circumstances surrounding Culombe's interrogation, it pointed out, at page 630:

"Moreover, Culombe was subjected to other pressures not brought to bear on Fikes. By Lieutenant Rome's arrangement, Mrs. Culombe was permitted—indeed asked—to confront her husband and tell him to confess.

Culombe's thirteen-year-old daughter was called upon in his presence to recount incriminating circumstances. This may fall short of the crude chicanery of employing persons intimate with an accused, to play on his emotions, that was involved in Spano v New York, 360 US 315, 79 S Ct 1202, 3 L ed 2d 1265. But it appears, in conjunction with all of the other circumstances, to have had precisely the effect that Rome, by his own admission, calculated: 'it is another way of getting a confession.' "

The circumstances of the cited cases are, of course, not identical to those depicted in this record. █ And "the question whether a particular criminal defendant's will has been overborne and broken is one, . . . that must be decided on the peculiar, individual set of facts of his case." Culombe v Connecticut, supra, at page 622. But it is also true only a close, relevant comparison of situations can evolve standards which are solidly and effectively enforceable. Indeed, such is the means by which the body of decisional interpretations is enlarged and enhanced for the edification of those charged with enforcement and administration of the law. And when the record before us is compared to those in which the Supreme Court has found present elements of psychological coercion amounting to a denial of due process, it is inevitable that one must conclude an issue was raised concerning whether Askew's confession was similarly infected.

This is not a case reflecting no more than a statement by police officers that they intended to check out an ordinary investigative lead. Cf. United States v Choate, 9 USCMA 680, 26 CMR 460. According to the evidence, accused, interrogated over a period of several hours, allegedly denied guilt of stealing Macklin's money until confronted with apparently contrary information in his wife's letters and a purported statement that it would, in light of his denial, be necessary to have her interviewed by civilian police. Indeed, he asserted he had not orally admitted guilt of stealing even the radio

or the suit, much less the money, until this matter was introduced. Thus, as in Rogers v Richmond and Culombe v Connecticut, both supra, we are confronted with allegations of investigators playing upon accused's emotions, his regard for his sick wife, and desire to keep her out of the matter, in order to obtain his confession. That Hunt and Gray were successful is established by testimony that the statement was, in effect, allegedly traded for the agent's "half-guarantee" that its delivery would insure his wife would not be harassed. Indeed, the agent's own qualms about the means which he used are reflected by his admission he told the accused "the fact that we had mentioned contacting his wife was not to be mentioned in the [police] report." There is little difference between Gray's alleged promise and the stratagem supposedly utilized in Rogers v Richmond, supra. Both would amount to impermissible psychological pressure which, in law, serves to deprive an accused of that freedom of will essential to the voluntariness of his confession. United States v Colbert, supra; United States v Acfalle, supra. In light of the provisions of Code, supra, ■■■■■■■ Article 31, 10 USC § 831, and the Supreme Court's condemnation of similar tactics under the Due Process Clause, we cannot condone the making of such an illicit bargain with a suspect or accused in order to obtain his statement. Confessions, when motivated by promises to leave one's wife alone, are simply not the product of a free and unfettered choice between speaking and remaining silent. We hold, therefore, that the voluntariness of accused's statement, allegedly obtained after the admitted discussion of interviewing his wife and the use of illegally seized letters, was placed in issue.

We turn, therefore, to an examination of the sufficiency of the president's instructions to the fact finders on the issue.

## III

In advising the court members concerning their duty with regard to ac-cused's statement, the president declared:

"You are advised that my ruling, receiving in evidence 'Prosecution Exhibit-4', the out-of-court statement of the accused with respect to the offenses of larceny, is final only on the question of admissibility. My ruling merely places the statement before the court; it does not establish the voluntary nature of the statement for each of you, in your deliberations upon the findings of guilt or innocence, must come to your own conclusions as to the voluntary nature of the statement. You may accept the statement as evidence only if you determine beyond reasonable doubt that it was voluntary. Otherwise, you must reject the statement and disregard it as evidence in the case. You are instructed in this connection that this out-of-court statement of the accused is not voluntary if it was obtained from the accused through the use of coercion, unlawful influence, or unlawful inducement. You are also advised that even if you determine beyond reasonable doubt that the statement was voluntary, you should consider the evidence which has been presented regarding voluntariness in determining the weight you will give to the statement."

It is obvious that the foregoing is no more than the verbatim recital of a standard form instruction ■■■■■■ on the voluntariness of confessions in general. It is in nowise tailored either to the evidence in the case or to the issues involved, i.e., the illegal seizure and use of the letters and the threatened interview with accused's wife if he did not confess. As such, there was no meaningful submission to the court-martial of the questions involved. United States v Acfalle, supra; United States v Smith, 13 USCMA 471, 33 CMR 3. As we said in the latter case, at page 474:

". . . What is contemplated [in properly framing instructions] is the affirmative submission of the respective theories, both of the Gov-

ernment and of the accused on trial, to the triers of fact, with lucid guideposts, to the end that they may knowledgeably apply the law to the facts as they find them. A liberal application of this approach will avoid the possible pitfalls that may attend instructing on barren and abstract legal principles in a vacuum. In any case, it surely benefits both parties to a proceeding, and obviously enhances the quest for truth and justice in a truly enlightened atmosphere."

The advice to the court here, completely untailored to the contentions of the parties and devoid of any mention of the effect of the use of the illegally seized letters, was insufficient to inform it of either the legal principles involved or how they might be applied to the factual matters. The members were left to rummage unguided among assorted legal concepts with no real information concerning their bearing upon the evidence or issues. Compare United States v Acfalle, supra. Under the circumstances, there is more than a fair risk that the court neither recognized nor resolved the real questions presented. We conclude, therefore, that the instructions were prejudicially insufficient. As the accused denied making any admissions, oral or written, concerning any of the offenses, prior to the alleged use of the letters and promise to him, the issue of voluntariness affects all charges and specifications. Complete reversal is, therefore, required.

The decision of the board of review is reversed. The record of trial is returned to The Judge Advocate General of the Air Force. A rehearing may be ordered.

Judge KILDAY concurs.

QUINN, Chief Judge (dissenting):

It is clear from the principal opinion that the only role played by the letters is that the reading of them led to the discussion about the need to interrogate the accused's wife. According to the accused's testimony, he confessed only to "avoid" having his wife interrogated. Consequently, the contents of

the letters are significant only insofar as they bear on the coercive influence asserted by the accused. From that standpoint they do not provide the basis for a separate instruction on their effect on the accused's confession. Cf. United States v Harman, 12 USCMA 180, 30 CMR 180. In other words, the illegal seizure of the letters was not a separate matter requiring submission to the court-martial as a separate factor affecting the voluntariness of the confession. The failure to mention the seizure of the letters in the instructions on voluntariness is, therefore, in my opinion, not error.

Turning to the effect of the "threatened" interrogation of the accused's wife, I am not at all sure the promise of a police officer to refrain from mere communication with a person closely associated with the accused, as distinguished from taking such person into custody, or otherwise implicating that person in the offense, is an improper influence. Cf. Rogers v Richmond, 365 US 534, 5 L ed 2d 760, 81 S Ct 735 (1961); United States v Choate, 9 USCMA 680, 26 CMR 460. However, I am willing for the purpose of this case to accept my brothers' interpretation of the evidence and to conclude that sufficient improper psychological pressures were present to raise an issue as to the voluntariness of the accused's confession. In my opinion, the record of trial convincingly shows that the court members were well aware of, and took into account, the accused's testimony on voluntariness.

The accused was represented by appointed defense counsel and individual military counsel, both of whom were qualified within the meaning of Article 27(b), Uniform Code of Military Justice, 10 USC § 827. Both read the instruction and had no "objection to the form or content." Their view of the sufficiency of the instruction was manifestly shared by the court members.

Before the pretrial statement was admitted into evidence, Government and defense counsel argued their respective positions as to the presence or

264

absence of a threat or promise to induce the accused to confess. Since each member of the court had a right to pass on the ruling as to admissibility (United States v Sears, 6 USCMA 661, 20 CMR 377), counsel's arguments were addressed to the president and *all the court members*. The president admitted the statement, without objection by any court member. Almost immediately thereafter, the prosecution and the defense rested, and counsel made their final arguments. Trial counsel pointed out that although the statement was in evidence, the question of voluntariness was still to be determined as one of the issues in the case. Similarly, defense counsel stressed the difference between the preliminary ruling on admissibility and a final finding as to voluntariness of the pretrial statement. He reviewed the facts surrounding the accused's execution of the statement, and he urged the court members to "agree that it was involuntary."

The instruction advised the court members that the ruling on admissibility did not determine the "voluntary nature" of the pretrial statement but merely placed it before the court-martial. The members were told each had to come to his own conclusion on voluntariness, and to accept the statement as evidence only if he determined "beyond reasonable doubt that it was voluntary"; and if he did not so find, he was to reject the statement and disregard it as evidence in the case. Finally, the court members were instructed the statement was not voluntary if it had been obtained "through the use of coercion, unlawful influence, or unlawful inducement."

In my opinion, the instruction, considered in the light of the immediately preceding arguments addressed to each member of the court, leaves no room to doubt that each member clearly understood the issue he had to decide, and the evidence upon which he could base his decision. United States v Anderson, 13 USCMA 258, 32 CMR 258; United States v Bullock, 12 USCMA 142, 30 CMR 142; cf. United States v Straub, 12 USCMA 156, 30 CMR 156. I would affirm the decision of the board of review.