UNITED STATES, Appellee

v

JOSEPH M. SIMPSON, Staff Sergeant, U. S. Air Force, Appellant

15 USCMA 18, 34 CMR 464

## No. 17,565

### September 11, 1964

*Major James E. Caulfield* argued the cause for Appellant, Accused. With him on the brief was *Colonel Daniel E. Henderson, Jr.,* and *Lieutenant Colonel James W. Logan.*

*Captain Donald W. Brewer* argued the cause for Appellee, United States. With him on the brief was *Colonel Emanuel Lewis.*

### Opinion of the Court

QUINN, Chief Judge:

After many years of honorable service as an officer, including combat in Europe during World War II, the accused rejoined the Air Force as a noncommissioned officer. He served with distinction until April 1963. Apparently overwhelmed and depressed by personal problems, he went absent without leave. On June 19, 1963, he was apprehended for that offense.

During his unauthorized absence, the accused issued a large number of bad checks. These became the subjects of thirteen specifications of larceny by check, and eight specifications of issuing worthless checks with intent to defraud, in violation of Articles 121 and 123a, Uniform Code of Military Justice, 10 USC §§ 921 and 923a, respectively. All charges were referred to a general court-martial for trial. The accused pleaded guilty to the unauthorized absence, but not guilty to the check charges. He was convicted as charged, and sentenced to a dishonorable discharge, total forfeitures, and confinement at hard labor for three years. The

convening authority approved the findings of guilty, but reduced the confinement to one year and modified the forfeitures.[1] A board of review affirmed.

Two issues are presented by this appeal. The first, which deals with the relationship between the bad check offenses defined in Article 123a, and larceny by check in violation of Article 121, was decided against the accused in United States v Barnes, 14 USCMA 567, 34 CMR 347. The second concerns documents taken from the accused's person when he was apprehended. He contends these papers were illegally seized, and improperly admitted into evidence at the trial.

For convenience, we have grouped the disputed items of evidence into four categories:

1. A book of blank checks imprinted with the name of the American Express Company branch at Kadena, Okinawa. The checks bore account number 63518. Several of the checks were missing. The serial

---

[1] Previous to our grant of review, the accused completed a period of retraining which led to suspension of the punitive discharge and his release from confinement.

number on the stubs of nine of the missing checks corresponded to nine of the checks allegedly issued by the accused in fictitious names.

2. Two checks bearing serial numbers corresponding to those on two stubs in the checkbook. The spaces on each check for the date, amount, and signature of the drawer on each check were filled in, but the payee line was blank. The name of the drawer, which was the same on each check, was not that of the accused; it was the same as that used on two of the checks set out in the larceny specifications.

3. A check drawn on the American Express Company branch at Sukiran, Okinawa. The date, amount, and name of the drawer, which was not that of the accused, were inserted in the proper places, but the payee space was blank.

4. Two handwritten documents. The first was dated April 18, 1963, and was addressed "To Whom It May Concern"; it was signed in the accused's name. The second was undated, unaddressed, and unsigned, but the handwriting was strikingly similar to that of the first paper. In substance, the writings reviewed some of the accused's problems and his intention to commit suicide. The court-martial was instructed the contents were admitted into evidence only as "handwriting samples of the accused," and were not to be considered on the merits.

Two days after his apprehension, the accused voluntarily gave an agent of the Office of Special Investigations samples of his handwriting. Preliminarily, he was informed of his rights under Article 31, Uniform Code of Military Justice, 10 USC § 831. The writings, and all the documents taken from the accused when arrested, were submitted to a questioned document examiner. At trial, the expert testified he compared the checks, which were the subject of the charges, with the other writings. In his opinion, the "same individual . . . executed" all the instruments. The expert also testified that the handwriting samples made by the accused after his arrest were themselves sufficient to support his conclusion as to the authorship of the checks.

On initial review, the staff judge advocate considered the law officer's ruling on the articles taken from the accused at his arrest. In his opinion, the incomplete checks and the two suicide notes were "evidentiary material," which were not subject to seizure, even in connection with a lawful search. However, he concluded the erroneous admission of these documents did not prejudice the accused, because the "other substantial and overwhelming evidence" established the accused's authorship of those checks which were the subject of the charges. When the case came before the board of review, it "assumed" the incomplete checks and the notes were merely "evidentiary materials"; but it also concluded the evidence did not prejudice the accused because it was "cumulative" and unimportant, in light of the other compelling evidence of guilt. Appellate defense counsel challenge the validity of these conclusions.

First, they maintain that all the items seized from the accused's person were unconnected with the offense for which he was apprehended and, therefore, could not legally be taken from him. The contention impliedly concedes, as it must in view of the evidence, that the accused's arrest was lawful. A search incident to a lawful arrest is proper. Articles found in the course of a search incident to a lawful arrest can be seized, and used against the accused, on the same basis as articles seized in a search conducted pursuant to a proper warrant. United States v Thomson, 113 F2d 643, 645 (CA 7th Cir) (1940). In either case, articles relating to an offense different from that which justified the search can be seized. United States v Abel, 258 F2d 485 (CA2d Cir) (1958), affirmed, 362 US 217, 4 L ed 2d 668, 80 S Ct 683 (1960), rehearing denied, 362 US 984, 4 L ed 2d 1019, 80 S Ct 1056 (1960); United States v Ross, 13 USCMA 432, 437–438, 32 CMR 432. There is, there-

-fore, no merit in this aspect of the accused's claim of error.

It is next contended that reversal of the accused's conviction is required because some of the seized articles were admitted into evidence in violation of his constitutional rights. The argument is predicated upon the nature of the property subject to seizure from the person or premises of the accused. It is said that instrumentalities or the fruits of an offense are subject to seizure when discovered in the course of a lawful search, but "mere evidentiary materials" cannot be seized under any circumstances. The difference between the two classes of property has been spelled out by the Supreme Court of the United States in construing the constitutional protections against self-incrimination and unreasonable search and seizure. See United States v Lefkowitz, 285 US 452, 76 L ed 877, 52 S Ct 420 (1932); Gouled v United States, 255 US 298, 65 L ed 647, 41 S Ct 261 (1921); Rule 41, Federal Rules of Criminal Procedure. The classification has not been free from criticism. See Wigmore, Evidence, §§ 2183–2184, 2263 (McNaughton rev. 1961). Also it would appear that mere mechanical application of the difference might lead to startling, if not absurd, results. For example, a confession is not the fruit or the instrumentality of a crime; yet, if the accused was arrested pursuant to a lawful warrant for the commission of a robbery and searched as an incident to the arrest, would it be reasonable to apply the doctrine to exclude a writing found in the accused's possession which amounts to a confession to the offense for which he was apprehended? See United States v Boyette, 299 F2d 92 (CA 4th Cir) (1962), cert den, 369 US 844, 7 L ed 2d 848, 82 S Ct 875 (1962); cf. United States v McDaniel, 154 F Supp 1 (DC DC) (1957), affirmed, 255 F2d 896 (CA DC Cir) (1958), cert den, 358 US 853, 3 L ed 2d 87, 79 S Ct 82 (1958). To our knowledge, no court has gone so far as to require the return of a document so directly related to an offense, on the ground it is mere evidence of the crime. See United States v Rees, 193 F Supp 849, 855 (DC Md) (1961). The limit to which appellate defense counsel would have us push the distinction between evidence and the instrumentality or fruit of a crime indicates the need for serious rethinking of the doctrine and its operation.

Since the matter is constitutional in nature, we have been guided by the decisions of the Supreme Court. We have applied the distinction between the seizure, in the course of a lawful search, of mere evidence of the offense, and the seizure of the fruits and instrumentalities of an offense. United States v Vierra, 14 USCMA 48, 33 CMR 260; United States v Rhodes, 3 USCMA 73, 11 CMR 73. But it is not always easy to determine whether a particular article or writing is merely evidentiary material, or is capable of being used as an instrument or agency for the perpetration of an offense. The differences, we observed in the Rhodes case, supra, at page 75, are "shadowy, indistinct, and elusive indeed." See also United States v Vierra, supra; United States v Stern, 225 F Supp 187 (SD NY) (1964).

Notwithstanding the general difficulties of the question, the first three groups of writings taken ■■■■■■ ■ from the accused clearly fall within the seizable class. The checkbook was the patent source of the bad checks issued by the accused; if not actually an instrumentality of the larceny offenses, it is "so closely related . . . [that] it is not unreasonable to consider" it was employed to carry out the illegal acts. Marron v United States, 275 US 192, 199, 72 L ed 231, 48 S Ct 74 (1927). The incomplete checks were not being used at the moment of the accused's arrest, but they were kept to be utilized when needed for the commission of an offense. Gouled v United States, 255 US 298, supra, at page 309. In fact, the accused later admitted in a pretrial statement that he had, just before his arrest, prepared one of the checks for the purpose of cashing it. These checks could be seized to prevent the commission of other offenses. United States v Lefkowitz, 285 US 452, supra, at page 466. The handwritten notes are more difficult to classify. Attempt-

**21**

ed suicide has been held to be a violation of military law. Dig Ops, 1912–40 § 453(4). A writing bewailing one's outcast state which leads to the conclusion that life is empty and meaningless and ought to be ended can, perhaps, persuade the writer to attempt suicide. So viewed, the writing might be considered a "means" of the offense. See 57 CJS, Mean, page 475. Whether the notes taken from the accused can reasonably be construed as tending to induce suicide need not, however, detain us. With the board of review, we can assume they had mere evidentiary value, and as such were not subject to seizure. They should not, therefore, have been admitted into evidence against the accused. What effect did the error have upon the substantial rights of the accused?

Appellate defense counsel maintain that since the notes were taken from the accused in violation of ▆▆▆▆ his constitutional rights, the conviction must be reversed, even though their admission into evidence could not possibly have harmed the accused. The argument has been advanced in other cases; but we have, with other Federal courts, consistently held that reversal of an otherwise valid conviction is not required if the improperly seized evidence presents no fair risk of prejudice to the accused. See United States v Battista, 14 USCMA 70, 33 CMR 282; United States v Justice, 13 USCMA 31, 32 CMR 31. The test for prejudice would appear to be peculiarly appropriate when, as in this case, the search is lawful, most of the property seized is subject to lawful seizure, and there is doubt whether the disputed property is not also seizable. See United States v Ross, supra. We have previously observed intimations by the Supreme Court of the United States that the stringent rule advocated by counsel here might be necessary to effectuate the constitutional protections of an accused. See United States v Vierra, supra, at page 54. In view of our own decisions on the subject, we do not consider it wise to adopt so rigid a formula of reversal in advance of the Supreme Court of the United States. We, therefore, turn to the evidence to determine if any prejudice to the accused could result from the inadmissible "suicide" notes.

Earlier, we noted that the accused voluntarily submitted fifteen samples of his handwriting to an ▆▆▆▆ OSI agent. He specifically admitted to the agent that he issued three of the checks charged against him. As to the remainder, he said he "could not make a positive statement" but he "may have been the author" of them. Other admissions, however, reveal his doubt to be wholly unfounded. He stipulated at trial that he never had an account in his own name in any of the branches of the American Express Company on Okinawa. He admitted he obtained, by stratagem, from a teller in the Kadena branch of the bank the checkbook found in his possession. He also admitted the writing on the check stubs was his; and it was all "purely fictional." In addition, he confessed he was the author of all the partially completed checks found on his person at the time of his apprehension. Two of the latter came from the checkbook in the accused's possession; and the name of the drawer was the same as that on two of the checks in the larceny specifications. The name of the drawer on the third incomplete check was that of a dead friend of the accused.[2] The Government's handwriting expert testified he

---

[2] At trial, defense counsel contended these statements were inadmissible because the seizure of the items to which they related was illegal. We have pointed out in the text that these items were properly subject to seizure as incidental to the accused's apprehension. Consequently, these could not taint the statements made by the accused two days later, with full warning of his rights under Article 31. There is no evidence whatever as to the effect of the seizure of the "suicide" notes on the accused's willingness to talk about the offenses. See United States v Dutcher, 7 USCMA 439, 22 CMR 229. The board of review considered the entire problem, and concluded, as a matter of fact, that the accused's statements were not influenced in any way by the fact that.

did not need the "suicide" notes for his examination, and his opinion as to the authorship of the checks which were the subject of the charges did not depend upon the notes. All of this evidence was uncontradicted and unimpeached. And, there is not a scintilla of evidence to cast doubt on the proven fact that the accused was the author of the checks which were the subject of the charges. We agree with the board of review, therefore, that the "suicide" notes, which were admitted only as additional samples of the accused's handwriting, were entirely cumulative, and could not have played any part in the court-martial's verdict of guilty.

The decision of the board of review is affirmed.

Judge KILDAY concurs.

FERGUSON, Judge (concurring in part and dissenting in part):

I concur in part and dissent in part.

The issue before us regarding the preemption of Uniform Code of Military Justice, Article 121, 10 USC § 921, by Code, supra, Article 123a, 10 USC § 923a, is governed, as the Chief Judge notes, by United States v Barnes, 14 USCMA 567, 34 CMR 347. With this portion of his opinion, I concur.

I also agree that the search of the accused was incident to his lawful arrest and that seizure of the checks and checkbooks was properly made. Harris v United States, 331 US 145, 91 L ed 1399, 67 S Ct 1098 (1947), conclusively settles so much of the question before us adversely to the accused. I disagree, however, with regard to the discussion of the seizure of the purported suicide notes and to the retrogression from our previously settled opinions regarding the obtaining by legal forces of mere evidentiary materials. See United States v Vierra, 14 USCMA 48, 33 CMR 360; United States v Battista, 14 USCMA 70, 33 CMR 282; and United States v Askew, 14 USCMA 257, 34 CMR 37. Moreover, I believe that securing to an individual his constitutional protections is too important to

the articles had been taken from his possession. See United States v Askew, 14 USCMA 257, 34 CMR 37.

be thrust aside as harmless error. Cf. Uniform Code of Military Justice, Article 59, 10 USC § 859.

Each of the two exhibits in question consist of closely written sheets detailing purported reasons for accused's behavior. The first, dated April 18, 1963, is a suicide letter addressed "To Whom It May Concern" and details the reasons in general which had led him to conclude to take his own life. It includes the following:

"My debts have pyramided to such an extent that I can no longer face either my associates or myself.

•    •    •    •    •

"I wish to apologize—for all the good that does—to all of the people who trusted and had faith in me for failing you. This factor is the paramount issue involved in the commission of this dastardly deed."

The second exhibit referred to the Air Force as a "pseudo service"; declared that "the Communist dominated services are superior in their methods to insure obedience to Command"; stated that the "unwarranted action by the Bank of America in their causing a check of mine to be returned while I was on the control roster placed me in the position of having to be dishonest"; and complained of exorbitant demands by his ex-wife. Simpson then wrote that he had been counseled for three months "by people with less intelligence than I to such an extent that I had to get away." He went on to state:

"The Service, to which I dedicated my life, has deteriorated to such an extent that I can no longer have any pride in it. The civilians look upon us as parasites—good only for the money that they can get from us. The Service thinks of us as children. Any and all of our personal business is aired to any and all of the 'so-called' people in command (I purposely omitted the title of *Commanding Officer*—that title disappeared when politics entered the Service."

These papers, seized from the accused, clearly fall within the classification of evidentiary materials, having no

**23**

value beyond mere proof of his behavior and in no way being characterized either as the fruits of a crime or any sort of instrumentality for its commission. The reference in the principal opinion to the criminal nature of attempted suicide is mere verbiage, for there is not the slightest indication in this record that the accused ever embarked upon such a course. Moreover, it is certain that he was not charged with any such misconduct, or that the second paper intimated anything concerning such a rash departure from human norms. The fact of the matter is that these amount to no more than personal writings which, under the Fourth and Fifth Amendments, could not be taken from Simpson and used in evidence against him.

Long ago, in Boyd v United States, 116 US 616, 29 L ed 746, 6 S Ct 524 (1886), the Supreme Court condemned the seizure of one's private papers for use in evidence against him, and pointed out, at page 633:

> ". . . [The Fourth and Fifth Amendments] throw great light on each other. For the 'unreasonable searches and seizures' condemned in the Fourth Amendment are almost always made for the purpose of compelling a man to give evidence against himself, which in criminal cases is condemned in the Fifth Amendment; and compelling a man 'in a criminal case to be a witness against himself,' which is condemned in the Fifth Amendment, throws light on the question as to what is an 'unreasonable search and seizure' within the meaning of the Fourth Amendment."

The Court held that a Federal enactment providing for the compulsory production of self-incriminating evidence violated not only the Fifth Amendment, but also the Fourth Amendment, as such seizure of private papers was therein prohibited.

Similarly, in Go-Bart Importing Co. v United States, 282 US 344, 75 L ed 374, 51 S Ct 153, the Court condemned as lawless and unreasonable a search made only for evidence of crime, as opposed to its instrumentalities or fruits. And in United States v Lefko-

witz, 285 US 452, 76 L ed 877, 52 S Ct 420, it pointed out that there could be no valid search under the Fourth Amendment in order to procure material whose only value lay in serving as evidence against a defendant. See also Ballmann v Fagin, 200 US 186, 50 L ed 433, 26 S Ct 212 (1906), and Interstate Commerce Commission v Baird, 194 US 25, 48 L ed 860, 24 S Ct 563 (1904). And in Hale v Henkel, 201 US 43, 50 L ed 652, 26 S Ct 370 (1906), at page 76, Mr. Justice Brown, speaking for the Court, declared:

> "We are also of opinion that an order for the production of books and papers may constitute an unreasonable search and seizure within the 4th Amendment. While a search ordinarily implies a quest by an officer of the law, and a seizure contemplates a forcible dispossession of the owner, still, as was held in the Boyd Case, the substance of the offense is the compulsory production of private papers, whether under a search warrant or a subpoena duces tecum, against which the person, be he individual or corporation, is entitled to protection."

Notwithstanding the belief of the author of the principal opinion that there is "the need for serious rethinking of the doctrine and its operation," it appears to me this Court has carefully considered the extent of the Supreme Court's holdings in Boyd, supra, and the other cases cited, and, following that august tribunal, has concluded that the seizure and use in evidence of mere evidentiary materials is forbidden by the Fourth Amendment.

Thus, in United States v Rhodes, 3 USCMA 73, 11 CMR 73, this Court held that a journal of black-market transactions was admissible in evidence because it did not constitute mere evidence of crime but was an instrumentality thereof. In reaching that conclusion, soundly supported by the decision of the Supreme Court in Marron v United States, 275 US 192, 72 L ed 231, 48 S Ct 74, we unanimously stated, at page 75:

> ". . . The premise for this argument is, of course, that the

24

diary falls within that class of property which can never be made the subject of a lawful search and seizure. That there is such a category—customarily characterized as 'mere evidentiary materials'—is firmly recognized."

In United States v Vierra, supra, a majority of the Court found that the seizure of a coffee shop card, amounting to no more than a mere advertising lure and not the means or instrumentality by which the offense of larceny by check was committed, could not be the subject of seizure in a lawful search. In so holding, Judge Kilday, with my concurrence, declared, at page 53:

". . . The Supreme Court of the United States has led in circumscribing the objects of lawful search and seizure, at least insofar as the seizure of evidentiary articles is concerned, declaring that search warrants may not be used as a means of gaining access to a man's house or office solely for the purpose of searching to secure evidence to be used against him in a criminal proceeding. . . . In this regard, there is firmly recognized a category of property customarily characterized as 'mere evidentiary materials' which can never be made the subject of a lawful search and seizure. . . . This protection is secured within the provisions of the Fifth Amendment to the Constitution, for in legal contemplation such search and seizure of private books and papers compels the owner to be a witness against himself by the most potent evidence—his writings and records."

Again, in United States v Battista, supra, the Court upset the accused's conviction on the basis of an impermissible search for evidence which did not amount to either the instrumentalities or the fruits of the crimes charged against him. Here, we adverted once more to the doctrine in question, saying, at page 72:

". . . The agents had no reason to believe that Dr. Battista had possession of any instrumentalities of his crime, its fruits, or other proper objects of a search. Gouled v United States, 255 US 298, 65 L ed 647, 41 S Ct 261 (1921); United States v Lefkowitz, 285 US 452, 76 L ed 877, 52 S Ct 420, 82 ALR 775 (1932). The search was simply instituted for the purpose of securing evidence with which to convict the appellant of sodomy. A general exploratory search for matter which is not directly connected with the commission of a suspected offense is forbidden."

Finally, in United States v Askew, supra, it appeared that letters to the accused from his wife were seized by agents during a "lawful" search of his locker. These apparently revealed he had forwarded money to her and were used to induce him to confess his guilt of larceny. In reversing, we adverted at length to the principle here in question:

"First, while the record establishes an authorized search of accused's belongings, it equally establishes a seizure of accused's private correspondence and its use during his interrogation. And it is made clear that these letters from his wife were neither instrumentalities nor fruits of any crime. Cf. Marron v United States, 275 US 192, 72 L ed 231, 48 S Ct 74 (1927). We have recently had occasion to delve at length into this problem and have heretofore set forth the principle that one's private papers may not be so seized.

.   .   .   .   .

"We recognized the applicable concept, i.e., that lawful searches must be limited to seizure of the fruits or instrumentalities of crime, as early as United States v Rhodes, 3 USCMA 73, 11 CMR 73, although, in that case, we found the questioned material to constitute a means by which accused committed his offenses. Nor is this guiding limitation a recent innovation in the law. It was considered by the Supreme Court in the landmark case of Boyd v United States . . . and has since been regularly applied [citations omitted]."

These authorities establish beyond cavil the impropriety of seizing the two

**25**

exhibits here in question. The documents have not the slightest connection with the offenses which the accused had allegedly committed and are obviously documents of the most personal nature. As they are neither instrumentalities of his crimes, nor the fruits thereof, they should not have been seized. United States v Vierra, United States v Battista, United States v Askew, all supra. Their receipt in evidence was, therefore, as the staff judge advocate and the board of review noted, clearly erroneous.

That such error was specifically prejudicial to the substantial rights of the accused seems equally established. While the evidence against the accused is strong, it is not so compelling as to require the return of a verdict of guilty. It is made up largely of admissions—as opposed to a confession—of the accused regarding the checks and expert testimony that he prepared the instruments involved, based in part upon use of the exhibits erroneously admitted. The expert witness did opine that he would have concluded them to have been written by the accused without regard to the letters in question, but the fact remains he did utilize them in reaching his opinion and they were received in evidence on that basis. Compare United States v Vierra, supra.

Moreover, the contents and tenor of the documents obviously weigh heavily against an opportunity for the accused to receive a fair hearing. The statement of an intention to commit suicide, recounting of financial difficulties, and personal assumption of responsibility for his actions could not but be considered by the fact finders as strongly indicative of guilt. The contents of the second document, so bitterly critical of the Air Force, with its sarcastic references to lack of command responsibility, immaturity among officers, and comments regarding failure to maintain discipline, likewise could not have failed to affect the court members in their attitude toward the accused. Indeed, the situation, with due regard for the nature of the offenses, is not unlike that in United States v Battista, supra, in which we held the receipt of improperly seized photographs of nude males presented a fair risk of prejudice concerning charges to which they were not related. The fact of the matter is, as we have previously noted, the human mind does not change simply because its possessor goes into a jury box; it is not a slate which can be wiped clean by limiting instructions or being told to ignore facts clearly presented to it. United States v Grant, 10 USCMA 585, 28 CMR 151. In short, there is presented here a fair risk that the court members were affected in their deliberations on the guilt or innocence of the accused, and I would reverse on that basis.

The principal opinion, however, goes further, and concludes that only the doctrine of specific prejudice governs violation of constitutional principles. With that concept, I must also disagree, for I believe that any violation of a constitutional protection, regardless of the weight of other evidence, requires reversal by this Court. In view of the discussion of this matter by my brothers, I set forth the reasons which lead me to this conclusion.

For many years the Supreme Court followed the principle that the effect of receipt in evidence of items of proof obtained through unlawful search and seizure was to be measured by a determination whether the error was "prejudicial to the substantial rights" of the accused. Agnello v United States, 269 US 20, 70 L ed 145, 46 S Ct 4 (1925); Brock v United States, 223 F2d 681 (CA 5th Cir) (1955). During this era, however, the rule prohibiting the receipt of such evidence was considered to be a principle of proof administered by the Court in connection with its responsibility for supervision of Federal trials. Weeks v United States, 232 US 383, 58 L ed 652, 34 S Ct 341 (1914); Wolf v Colorado, 338 US 25, 93 L ed 1782, 69 S Ct 1359 (1949); Rule 41, Federal Rules of Criminal Procedure. Such is no longer the state of the law, for, in Mapp v Ohio, 367 US 643, 6 L ed 2d 1081, 81 S Ct 1684 (1961), Mr. Justice Clark declared, at page 655:

". . . We hold that all evidence obtained by searches and seizures in violation of the Constitution is, by

the same authority, inadmissible in a . . . court."

He went on to state that "the exclusionary rule is an essential part of both the Fourth and Fourteenth Amendments." *Ibid.*, at page 657. That we deal, therefore, no longer with a rule of evidence but with a principle of constitutional law is indisputable. Aguilar v Texas, 378 US 108, 12 L ed 2d 723, 84 S Ct 1509 (1964).

It seems to me that harmless error statutes have no place in enforcing constitutional mandates. Kotteakos v United States, 328 US 750, 90 L ed 1557, 66 S Ct 1239 (1946), indicates that such statutes apply, "except perhaps where the departure is from a constitutional norm or a specific command of Congress." *Kotteakos*, supra, at page 764. And in Bruno v United States, 308 US 287, 84 L ed 257, 60 S Ct 198 (1939), the Court said of the Federal harmless error statute, at page 294:

"... Suffice it to indicate, what every student of the history behind the act of February 26, 1919, knows, that that Act was intended to prevent matters concerned with the mere etiquette of trials and with the formalities and minutiae of procedure from touching the merits of a verdict. Of a very different order of importance is the right of an accused to insist on a privilege which Congress has given him."

This Court itself has adopted in other areas such an approach of reversible error *per se*. Thus, in United States v Wilson, 2 USCMA 248, 8 CMR 48, we early held that "a departure from the clear mandate of . . . Article [31] . . . [was] generally and inherently prejudicial." And, in United States v Lee, 1 USCMA 212, 2 CMR 118, we said, at page 216:

"Two possible limitations on the manifest and proper policy of Article 59 (a) and similar legislation have been proposed elsewhere, and we mention them with approval. First, where the error involves a recognizable departure from a constitutional precept, and, second, where it constitutes a departure from an express command of the legislature. See Kotteakos v United States, supra."

Our own cases, therefore, command that we give effect to constitutional protections and reverse here. Our pole star is to be found in the following:

". . . The tendency of those who execute the criminal laws of the country to obtain conviction by means of unlawful seizures . . . should find no sanction in the judgments of the courts, which are charged at all times with the support of the Constitution, and to which people of all conditions have a right to appeal for the maintenance of such fundamental rights." [Weeks v United States, supra, at page 392.]

I would reverse the decision of the board of review and remand the record of trial to The Judge Advocate General of the Air Force for a rehearing on the bad check charges or reassessment of the sentence on the unauthorized absence offense.